## WAYNE STEPHEN YOUNG *v.* STATE OF MARYLAND

[No. 79, September Term, 1971.]

*Decided March 2, 1972.*

The cause was argued before MORTON, ORTH and GIL-BERT, JJ.

540

*William F. Mosner* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Howard L. Cardin* and *Arrie W. Davis, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

I

An inhabitant of the State of Maryland, as a part of the legacy of the common law of England bequeathed him by the People,[1] is not responsible for his criminal conduct if he was insane at the time he committed the crime.[2] Blackstone in Chapter II of Book the Fourth of his *Commentaries on the Laws of England,* speaking of persons capable of crimes, asserts at 24, "In criminal cases, therefore, idiots and lunatics are not chargeable for their own acts, if committed when under these incapacities; no, not even for treason itself." [3] The "de-

1. "We, the People of the State of Maryland, grateful to Almighty God for our civil and religious liberty, and taking into serious consideration the best means of establishing a good Constitution in this State for the sure foundation and more permanent security thereof, declare: * * * That the Inhabitants of Maryland are entitled to the Common Law of England, * * *." Preface and Art. 5, *inter alia,* Declaration of Rights, Constitution of Maryland.

2. Historically in English law insanity was not regarded as having any bearing upon the matter of criminal guilt and this principle, dating prior to the Norman Conquest persisted into the thirteenth century. "[A] man who has killed another by misadventure, though he may deserve a pardon, is guilty of a crime, and the same rule applies * * * to a lunatic * * *." 3 Holdsworth, *History of English Law* 371 (5th ed. 1942). The gradual change in this point of view is traced by Perkins in his *Criminal Law,* 2nd ed., pp. 850-852. By the time of Henry III it was not uncommon for the king to grant a pardon as a special act of grace for one who had committed homicide while of unsound mind, and in the reign of Edward I, although there was no change in the theory of guilt, such a homicide was entitled to a special verdict that the accused committed the crime while mad. This verdict practically assured the grant of a pardon. During the reign of Edward II insanity was beginning to be recognized as a defense to crime and in the time of Edward III (1327-1377) absolute "madness" became a complete defense to a criminal charge.

3. "The second case of a deficiency in will, which excuses from

fense of insanity or lunacy on behalf of one charged with a crime, offense or misdemeanor" received statutory recognition in this jurisdiction in 1826. Ch. 197, § 1, Acts 1826. By 1889 the provisions of the statute were considered as having "long been part of the law of the State." *Devilbiss v. Bennett,* 70 Md. 554, 556. "They provide a mode by which lunatics, and insane persons when tried for or charged with a commission of crime shall be humanely dealt with and treated. They recognize the rule which prevails in all civilized nations that such unfortunate persons ought not to be subject to the same penalties or treatment as are justly meted out to those who are sane." *Ibid.*

The kind and degree of unsoundness of mind could not be determined as a matter of law before pardons were issued as a matter of course upon a verdict that the accused committed the crime while mad, for prior thereto all depended upon the king's "grace." 2 Pollock & Maitland, 484 (2d ed. 1899). When the law began to notice insanity as a defense, Bracton, Chief Justiciary in the middle of the thirteenth century, defined a madman as "one who does not know what he is doing, who lacks in mind and reason and is not far removed from the brutes." [4] Twenty-five years after Coke quoted Bracton's definition in *Beverley's Case,* he classified *non compos mentis* into the born idiot, the madman—one who "wholly loseth his memorie and understanding," and the lunatic —one who has lucid intervals but is *non compos mentis* during periods when "he hath not understanding." 2 Co. Litt. 247 a (Rev. ed. 1823) as cited in Perkins, *supra,* at 851. In any event, it was in 1843 in *Daniel M'Naghten's Case,* 10 Clark & Fin. 200, 8 Eng. Rep. 718 that the law

---

the guilt of crimes (the first was infancy or nonage) arises also. from a defective or vitiated understanding, viz., in an idiot or a lunatic. For the rule of law as to the latter, which may easily be adapted also to the former, is that 'furiosus furore solum punitur.' " *Ibid.*

4. Perkins states this is as quoted in *Beverley's Case,* 4 Coke 123 b, 124 b, 76 Eng. Rep. 118, 1121 (1603). See *Parker v. State,* 7 Md. App. 167 for discussion of various definitions of "insanity" in the early law.

as it had been developing for hundreds of years was crystallized. M'Naghten was tried on a charge of murdering one Edward Drummond. Lord Chief Tindal in his charge to the jury said:

"The question to be determined is, whether at the time the act in question was committed, the prisoner had or had not use of his understanding, so as to know that he was doing a wrong or wicked act. If the jurors should be of opinion that the prisoner was not sensible, at the time he committed it, that he was violating the laws both of God and man, then he would be entitled to a verdict in his favour: but if, on the contrary, they were of opinion that when he committed the act he was in a sound state of mind, then their verdict must be against him."

The jury returned a verdict of not guilty, on the ground of insanity. The verdict and the question of the nature and extent of the unsoundness of mind which would excuse the commission of a felony of this sort was made the subject of debate in the House of Lords and it was determined to take the opinion of the Judges on the law governing such cases. Mr. Justice Maule and Lord Chief Justice Tindal appeared and answered five questions propounded to them. The opinion of the Judges was fully approved by the House of Lords and laid down as the settled law. It was so recognized by our Court of Appeals in 1888 in *Spencer v. State,* 69 Md. 28. Its understanding of the law as settled by M'Naghten was "that notwithstanding a party may do an act, being in itself criminal, under the influence of an insane delusion, with a view of redressing or revenging some supposed grievance, or injury, or of promoting some public good, he is nevertheless punishable, if he had the capacity to distinguish between right and wrong, and knew at the time that he was acting contrary to law. Therefore, if the party accused be conscious that the act was one that he ought not to do, that act being contrary to law, he is

punishable under the law." At 38. The so-called "M'Naghten-Spencer" test of responsibility for criminal conduct came to be expressed as whether the accused had the capacity and reason sufficient to enable him to distinguish between right and wrong and understand the nature and consequences of his acts as applied to himself. *Bradford v. State,* 234 Md. 505, 510; *Dubs v. State,* 2 Md. App. 524, 534. The test, although subject to vehement criticism, withstood constant attacks on its constitutionality and propriety. See *Leland v. Oregon,* 343 U. S. 790; *Armstead v. State,* 227 Md. 73; *League v. State,* 1 Md. App. 681. Both the Court of Appeals and this Court felt that any modification of the rule was a prerogative of the legislature and not the courts and rejected pleas to modify or abandon it. The legislature responded in 1967. By ch. 709, Acts 1967, it supplanted the M'Naghten-Spencer test with the American Law Institute test contained in § 4.01 of the Model Penal Code. Codified as Code, Art. 59, § 9 (a) it provided:

> "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

The legislature did not define "mental disease or defect," but it did expressly exclude therefrom "an abnormality manifested only by repeated criminal or otherwise antisocial conduct." See *Avey v. State,* 9 Md. App. 227, 240-241; *Millard v. State,* 8 Md. App. 419; *Greenleaf v. State,* 7 Md. App. 575; *Strawderman v. State,* 4 Md. App. 689. It was careful to spell out the applicability of the new test. It further enacted by § 2 of ch. 709 "That the pro-

visions of this Act shall be applicable to all cases tried or scheduled for trial on and after the effective date of this Act." The effective date of the Act was established as 1 June 1967 by § 5. These provisions were a clear legislative expression that the Act apply to cases tried on or after 1 June 1967, and *a fortiori,* not to cases tried before 1 June 1967. We so stated in *League v. State, supra,* at 685. In *Stokes v. State,* 2 Md. App. 385, cert. den., 248 Md. 735, we refused to depart from our holding in *League* in the face of the argument that the language of § 2 did not preclude giving retroactive effect to the Act: "that had the Legislature intended non-retroactivity, the word 'only' would have been employed," and that, therefore, the Act should be construed as retroactive. We observed, at 387: "Such a construction, in our opinion, is strained, sophistic, and one not intended by the Legislature." We again affirmed our position in *McCracken v. State,* 2 Md. App. 716, 718.

The new test of responsibility for criminal conduct was in effect for three years. Then in 1970, with none of the fanfare which surrounded the abolition of the venerable common law test, the legislature changed the new test. It came about by the repeal "in its entirety" of Code, Art. 59, title, "Lunatics and Insane", and the enactment to stand in its place of a new Art. 59 under the new title "Mental Hygiene." Acts 1970, ch. 407, § 2. The test for responsibility for criminal conduct was set out in § 25 (a) of the new Article. The test was the same as the 1967 test with one exception; the terms "mental disease or defect" were replaced by the term "mental disorder." This exception was of the utmost significance, however, in the light of other provisions of the new Act. Section 3 (f) defined "mental disorder" to mean "mental illness or mental retardation or any other form of. behavioral or emotional illness resulting from any psychiatric or neurological disorder." Section 3 (g) defined "mental illness" to mean "any mental disorder, other than mental retardation, which so substantially impairs the mental or emotional functioning of an individual as to make it

necessary or advisable for the welfare of the person so suffering or for the safety of the persons or property of others that the mentally ill person receive care and treatment." It provided further: "The term shall replace the words 'insane,' 'insanity,' 'lunacy,' 'mentally sick,' 'mental disease,' 'unsound mind' and similar words as they appear in the statutes of the State of Maryland but does not include mental retardation." Section 3 (h) defined "mental retardation" to mean "a degree of subnormality of intellectual development expected to be of life duration which reduces the individual's capability to manage himself or his affairs." It provided further: "The term shall replace the terms 'defective,' 'mental defective,' 'idiot,' 'feebleminded' and 'moron' as they may appear in the statutes of the State of Maryland." We see nothing in § 25 (a) to indicate that the term "mental disorder" was clearly intended to have a different meaning than as defined in § 3.[5]

The test of responsibility for criminal conduct as enunciated in Art. 59, § 25 (a) is:

> "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disorder, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms 'mental disorder' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Applying the meaning of "mental disorder" and the meanings of the terms used in defining its meaning as set out in § 3, the test reads:

A defendant is not responsible for criminal

---

5. Section 3 entitled "Definitions" begins: "As used in this Article, the following terms shall have the meanings indicated unless a contrary meaning is clearly intended from the context in which the term appears: * * *."

conduct and shall be found insane at the time of the commission of the alleged crime, if at the time of such conduct he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, because of:

(1) any mental disorder which so substantially impaired his mental or emotional functioning as to make it necessary or advisable for his welfare or for the safety of the persons or property of others that he receive care and treatment; OR

(2) a degree of subnormality of intellectual development expected to be of life duration which reduced his capability to manage himself or his affairs; OR

(3) any other form of behavioral or emotional illness,

which, as to any of the three, were the result of any psychiatric or neurological disorder other than an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

We summarized the procedure in applying the test in *Sherrill v. State*, 14 Md. App. 146, after finding it clear that the change in the criminal responsibility test was intended by the legislature to be one of substance and not merely one of form: [6] "Thus, under the Section 25

---

6. We said, at 155: "Considering the broad but precise legislative meaning given the term 'mental disorder' by Section 3 (f) in juxtaposition with the undefined term 'mental disease or defect,' formerly contained in Section 9 (a), it is readily evident that the Legislature intended more than a simple substitution of terms commonly understood by psychiatrists, lawyers, and judges as having the same or equivalent meaning. Indeed, as illustrated by the testimony in the present case, there was a considerable conflict of expert opinion among the testifying psychiatrists with respect to whether appellant's mental condition, which was variously labeled a psychosis, a neurosis, schizophrenia, pedophilia, a character disorder, and a personality disorder, rose to the level of a 'mental disease or defect' within the ambit of Section 9 (a), or was merely one of a multitude of mental disorders recognized and classified within the

(a) test of criminal responsibility, recognizing that an abnormality manifested only by repeated criminal or antisocial conduct cannot qualify as a 'mental disorder,' psychiatrists would first be asked the threshold question—whether the accused, at the time of the crime, had a mental disorder, *i.e.,* a 'mental illness or mental retardation or any other form of behavioral or emotional illness'; if so, is it the result of 'any psychiatric or neurological disorder', and, if so, did it cause the accused to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Unlike ch. 709, Acts 1967, replacing the M'Naghten-Spencer test with the "mental disease or defect" test, ch. 407, Acts 1970, contained no express provision with regard to the application of the Act within the frame of reference of cases. Section 4 of the Act merely prescribed "That this Act shall take effect on July 1, 1970." The Act was approved 28 April 1970.

It was inevitable that questions arise as to the application of the Act, spurred by the variety of degrees of retroactivity enunciated from time to time by the Supreme Court of the United States with respect to the application of principles and rules of law announced in its judicial opinions in criminal causes. See *State v. Campbell & Reeves,* 7 Md. App. 538, 542-549 (concurring

---

*Diagnostic and Statistical Manual of Mental Disorders,* the so-called psychiatrist's bible, published by the American Psychiatric Association. Some of the psychiatrists saw no difference between a 'mental disease' and a 'mental disorder'; others thought there was a difference. Some of the psychiatrists believed that pedophilia was both a mental disease or defect and a mental disorder; others seemed uncertain as to whether it was a mental disease. One of the State's psychiatrists believed that pedophilia was not a mental disease or defect under Section 9 (a); that only a psychosis could qualify as a mental disease and that since pedophilia was not a psychosis, it could not be a mental disease, although it could be a mental disorder.

We think it not unlikely that it was because of the wide differences of opinion among psychiatrists respecting interpretation of the term 'mental disease or defect,' as used in Section 9 (a), that the Legislature determined to make use of a more concrete standard that all alike could understand and uniformly apply."

opinion). Defendants interposing the defense of insanity will, for obvious reasons, be anxious to have the issue determined under the "mental disorder" test and when the crime alleged was committed before 1 July 1970 will not only urge a retroactive application of the new test but will seek to apply that particular degree of retroactivity most favorable to them. We had the first of such cases before us in *Sherrill v. State, supra;* we have the second before us now.

Sherrill was indicted on 2 June 1970 for a crime committed on 26 September 1969. He pleaded insanity on 19 June 1970 and was referred for evaluation on 26 June. The report of the Perkins State Hospital was filed on 27 August. The medical staff found that he was responsible for his criminal conduct under the "mental disease or defect" test. Sherrill's trial began on 27 October 1970 before three judges. Two of them found he was sane and one thought that he was insane. Each made his finding under the "mental disease or defect" test. We found this to be error. We pointed out that "[n]o savings clause was included in Chapter 407 extending the operative effect of the 'mental disease or defect' standard formerly contained in Section 9 (a) beyond the effective date of the new Act so as to make it applicable in the post July 1, 1970 trial of cases which involved criminal conduct perpetrated prior to that date." We otherwise found nothing in the provisions of ch. 407 even remotely indicating a legislative intention to carry over the "mental disease or defect" standard to govern the merits of insanity pleas asserted at trials commencing after 1 July 1970.[7] And we did not believe that the general sav-

---

7. We explained, at 154: "The fact that under Section 25 (a), as under former Section 9 (a), the validity of an accused's insanity plea is to be adjudged with reference to his mental condition as it existed at the time the criminal act was committed does not mean that the test for criminal responsibility in effect at that time is controlling. The defense of insanity at the time of the commission of the crime takes on substance and becomes truly meaningful when the case is tried, its merits placed in issue and decided. We think it clear that the Legislature, in repealing Section 9 (a), and its undefined 'mental disease or defect' standard, and in enacting in

ings statute, Code, Art. 1, § 3 would make § 25 (a) apply to cases tried after 1 July 1970.[8]

In the case here reviewed, WAYNE STEPHEN YOUNG was indicted on 3 October 1969 for crimes committed on 29 September 1969. He pleaded insanity on 8 October. The resulting examinations of him with regard to his responsibility were clearly under the "mental disease or defect" standard. The indictment charging that he "feloniously, wilfully and of deliberate and premeditated malice aforethought, did kill and murder one Esther Lebowitz" came on for trial on 29 April 1970 before a jury in the Criminal Court of Baltimore under the special plea of insanity and the general plea of not guilty.[9]

---

its place the carefully defined 'mental disorder' standard in Section 25 (a), intended that the latter test would govern in all cases tried after July 1, 1970, regardless of when the offense was committed. Cf. *Janda v. General Motors Corp.*, 237 Md. 161; *Wittel v. Baker*, 10 Md. App. 531. To otherwise conclude would be to ascribe to the Legislature an intention to have two separate tests for criminal responsibility in effect at the same time, based on the insignificant criterion of when the criminal act was committed. Had the Legislature so intended, it would not, in our view, have made Chapter 407 effective July 1, 1970, without expressly including in the Act a savings clause or like provision to indicate such an intention."

8. Insofar as pertinent, Code, Art. 1, § 3 provides:

"The repeal, or the repeal and reenactment, or the revision, amendment or consolidation of any statute, or of any section, or part of a section of any statute, civil or criminal, shall not have the effect to release, extinguish, alter, modify or change, in whole or in part, *any penalty, forfeiture, or liability,* either civil or criminal, which shall have been incurred * * * [thereunder] unless the repealing, repealing and reenacting, revising, amending or consolidating act shall expressly so provide; * * *." (Emphasis added)

We said in *Sherrill*, at 154: "In the sense contemplated by this statute, a 'penalty, forfeiture, or liability' is, we think, something in the nature of a criminal or civil sanction actually incurred by reason of the statute's operative provisions. See *Bell v. State*, 236 Md. 356; *Brooks v. State Board*, 233 Md. 98; *State v. Kennerly*, 204 Md. 412; *State v. Clifton*, 177 Md. 572; *Green v. State*, 170 Md. 134. See also *Bell v. Maryland*, 378 U. S. 226 (footnote 4), at page 234. The defense of insanity in criminal cases is not, in our opinion, either a 'penalty, forfeiture, or liability', actually incurred, within the meaning of Section 3 or the Maryland cases construing that statute."

9. On 29 April 1970 the State called for trial both the murder indictment and an indictment charging the rape of Esther Lebowitz. A third indictment charging larceny returned against Young was not called. Young prayed a jury trial on the murder indictment and a court trial on the rape indictment. The State elected to proceed with the murder indictment.

The issue of Young's sanity *vel non* was submitted to the jury, see *Strawderman v. State*, 4 Md. App. 689, framed as follows:

> "At the time of the alleged crime on September 29, 1969, did the defendant, Wayne Stephen Young, as a result of mental disease or defect, lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law?"

The verdicts of the jury were rendered on 5 May 1970. The jury found him responsible for his criminal conduct at the time of the commission of the murder (they answered "No" to the issue as framed), and guilty of murder in the first degree. Sentence was deferred pending the filing of a motion for a new trial. The motion was timely filed, heard on 12 November and denied. Thereupon, on that date, the judge imposed sentence: "I commit Wayne Stephen Young to the jurisdiction of the Department of Correctional Services for the balance of his natural life, beginning from the date of arrest * * * October 2, 1969."

In the case before us, as in Sherrill's case, the crime was committed, the accused was indicted, and the evaluation of his sanity was ordered before 1 July 1970, the effective date of ch. 407, Acts 1970. The difference between the two cases, in this context, is that the guilt stage of Young's trial began and concluded prior to 1 July 1970 while Sherrill's trial did not begin until after that date. As to Sherrill there was no question but that the mental disorder test was in effect at the time of his trial; as to Young, there was no question but that the mental disease or defect test was in effect at the time of his trial. In *Sherrill* the question was whether the legislature intended the former mental disease or defect test to apply when the crime involved was committed prior to 1 July 1970 regardless of when the trial for that crime was had. As pointed out above, we concluded that such was not its intention. We found the intent to be,

and so held, that the new mental disorder test was applicable in all cases in which the trial commenced on or after 1 July 1970. Thus, with respect to the applicability of the mental disorder test, we have adopted a standard comparable to that established by *Johnson v. New Jersey,* 384 U. S. 719, for the application of the requirements of *Miranda v. Arizona,* 384 U. S. 436, to statements obtained within *Miranda's* contemplations. See *Boone v. State,* 3 Md. App. 11, 31-36. The *Miranda* exclusionary rules apply only to cases begun after the date of the *Miranda* decision; the mental disorder test of ch. 407, Acts 1970, applies only to cases begun after the effective date of the statute. In every case which has come before us presenting a question of the admissibility of a statement obtained within *Miranda's* contemplation we have held, following the lead of the Court of Appeals in *Westfall v. State,* 243 Md. 413, 420, that the *Miranda* principles do not apply when the trial of the case began before the date of the *Miranda* decision. See, for example, *Crumb v. State,* 1 Md. App. 98; *Sherrod v. State,* 1 Md. App. 433.

Young does not quarrel with the rule that generally the mental disorder test does not apply to trials beginning before the effective date of the Act enunciating it. But, he argues, with regard to appellate review, the new test should apply to cases still alive on appeal on 1 July 1970, a point not presented on the facts of *Sherrill.* What he urges is that with respect to the mental disorder test of responsibility for criminal conduct, its application should follow the standard adopted by the Court of Appeals as to the legal principle enunciated in *Schowgurow v. State,* 240 Md. 121.[10] We have not so applied the ex-

---

10. "We believe that the proper administration of justice requires, and we accordingly hold, that the legal principle enunciated in this case shall not apply retroactively, except for convictions which have not become final before rendition of this opinion." 240 Md. at 131-132. This degree of retroactivity was that enunciated in *Linkletter v. Walker,* 381 U. S. 618, with regard to the holding in *Mapp v. Ohio,* 367 U. S. 643 requiring exclusion in state criminal trials, of evidence seized in violation of the search and seizure provision of the 4th amendment.

clusionary rule of *Miranda*. We have consistently held it to be immaterial that the case was not finally decided because an appeal was in fact pending or because it was still within the possibility of appeal. See *Robinson v. Warden*, 5 Md. App. 68. We took the same view with respect to the application of the mental disease or defect test. We said flatly in *League v. State, supra*, at 685, on citation of *Johnson v. New Jersey, supra*, and *Westfall v. State, supra:* "Moreover, we do not find that the administration of justice requires that the concept be given retroactivity to cases pending on direct appeal where the trial thereof took place prior to June 1, 1967 [the effective date of the Act prescribing the mental disease or defect test]." We followed this finding in deciding *Stokes v. State, supra*, and *McCracken v. State, supra*, refusing to apply the mental disease or defect test retroactively to trials begun prior to its effective date even though each case was pending on direct appeal on such date. Young, intimating that we were wrong in *League*, exhorts us to depart from its finding with respect to the new mental disorder test. He points out that we observed that the facts in *League* would have compelled a finding that he was sane and responsible for his acts no matter whether the new or old test was applied. 1 Md. App. at 686.

Although we cited *Johnson v. New Jersey, supra*, and *Westfall v. State, supra*, in *League*, we do not believe that the same considerations are involved in determining the retroactivity *vel non* of a judicially formulated principle or rule of law as are involved in determining the retroactivity *vel non* of a legislative enactment. As to the former, the criteria guiding resolution of the retroactivity or non-retroactivity (and if retroactive, the degree thereof) of decisions expounding new constitutional rules affecting criminal trials implicate the purpose to be served by the new standards, the extent of the reliance by law enforcement authorities on the old standards, and the effect on the administration of justice of a retroactive application of the new standards. *Desist v. United States*,

89 S. Ct. 1030; *Stovall v. Denno*, 388 U. S. 293; *Scott v. State*, 7 Md. App. 505. And the question is properly to be resolved by the courts. But as to statutes, it is the intent of the legislature in enacting the law which controls. We made this clear in *McCracken v. State, supra,* at 718, in applying the *League* holding. So the question with respect to statutes is actually resolved by the Legislature, and the courts' function goes only to a determination, when such is necessary, of the legislative intent. See *Limitation of New Judge—Made Law to Prospective Effect Only; "Prospective Overruling" or "Sunbursting"*, by Thomas E. Fairchild, 51 Marquette Law Review 254-270 (1967-1968); *The Control of "Sunbursts": Techniques of Prospective Overruling,* by Walter E. Schaefer, 42 New York University Law Review 631-646 (1967).

Young relies primarily for support of his position that his responsibility should be judged under the mental disorder test, on what he alleges is Maryland's recognition that under its common law an appellate court applies the law in effect at the time of its decision even though the law was different at the time of the trial below. *Bell v. State,* 236 Md. 356, bespoke of the rule, but in terms of the repeal of a criminal offense, directly or by implication. The Court said, at 363:

> "It is clear that the common law of Maryland is that the repeal of a statute creating a criminal offense, after conviction under the statute but before final judgment, including the final judgment of the highest court empowered to review the conviction, requires reversal of the judgment, because the decision must accord with the law as it is at the time of final judgment * * *; and the general rule would seem to be the same * * *." (citations omitted)

It was this rule which apparently prompted the enactment of savings clauses which now comprise the substance of Code, Art. 1, § 3.[11] That section provides that

---

11. In *State v. Gambrill,* 115 Md. 506 (1911), the Court said, at

in the absence of an express provision to the contrary, no penalty, forfeiture or liability, either civil or criminal, shall be released, extinguished, altered, modified or changed, in whole or in part, by the repeal of any statute. We think, as we stated in *Sherrill*, see note 8 *supra*, that a "penalty, forfeiture, or liability" within the contemplation of the statute was "something in the nature of a criminal or civil sanction actually incurred by reason of the statute's operative provisions." We felt that the defense of insanity in criminal cases was not a "penalty, forfeiture, or liability, actually incurred, within the meaning of Section 3 or the Maryland cases construing that statute." For reasons like those leading to the conclusion that the statute preventing the application of the common law rule does not encompass the defense of insanity in criminal cases, we believe that the rule itself as articulated in *Bell* does not encompass the defense of insanity in criminal cases. There was no criminal offense created by ch. 709, Acts 1967, which was repealed by ch. 407, Acts 1970. *Bell v. Maryland*, 378 U. S. 226, does not lead to a different conclusion. *Bell v. State*, 236 Md. 356, above discussed, rendered on remand from the Supreme Court *Bell*, was aso decided, of course, in the context of the repeal of a criminal offense, as were the cases relied on therein, namely *Smith v. State*, 45 Md. 49, *Beard v. State*, 74 Md. 130, *State v. Gambrill*, 115 Md. 506, and *State v. Clifton*, 177 Md. 572. Nor do we find that the other cases cited by Young support his position that his responsibility must be determined by the test now in effect rather than by the test in effect at the time of his trial. They recite the general proposition that "an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence." *Woman's Club v. State Tax Comm.*, 195 Md.

---

513, "* * * after the repeal of a law no penalty can be enforced nor punishment imposed for its violation, when in force, without a savings clause in the repealing statute * * *." The legislature passed two general savings clauses, chs. 120 and 365, Acts 1912.

16, 19. Or, put another way, "a change in the law after a decision below and before final decision by the appellate court will be applied by that court unless vested or accrued substantial rights would be disturbed or unless the legislature shows a contrary intent." *Yorkdale v. Powell*, 237 Md. 121, 124. But the proposition has never been applied as Young suggests it now be applied. We do not find the cases he cites to be apposite in fact or in their rationale in applying the rule.[12] As set out herein,

12. In *Atwell v. Grant*, 11 Md. 101 the question was whether a promissory note not stamped as required by law was admissible in a suit for its payment. Subsequent to trial and prior to review on appeal the law requiring notes to be stamped was repealed. The Court held the decision below overruling objection to the note's admission could not be reversed because of the repeal but was careful to point out that the repealing act provided that all notes drawn prior to the repeal "shall be as good and valid as though they had been stamped, and all debts that have been created, where the proper vouchers are shown, shall be as valid in law as though the Stamp Act had never been passed."

As we read *State v. Norwood*, 12 Md. 177 the question was not the effect of a repeal of a law between the time the case below was decided and the appellate review, but whether the Clerk of the Common Pleas of Baltimore City was bound to collect and pay over monies collected by him for ordinary licenses. The court found that the law did not oblige him to do so.

The question in *Day v. Day*, 22 Md. 530 was whether a patent should issue. The Court said the determination of the question did not rest on the proceedings had in any given case alone, but on the further fact that the land for which a patent is sought, may by law be granted in that mode, when the question as to the issue of the patent comes to be finally adjudicated. At 538-539. The proceedings in the case, up to and including the appeal, were taken before an act was passed prohibiting the issue of the patent. But the Court found there was no interest vested in the claimant to except his case from the operation of the act and held that the patent should not issue. At 539-540.

*Price v. Nesbitt*, 29 Md. 263 involved the right to removal of causes, enlarged by constitutional provision. The general rule was invoked to comply with the constitutional mandate.

In *Wade v. St. Mary's Indust. School*, 43 Md. 178, proceedings to construct and open an avenue as a public highway were commenced and were being carried on under the provisions of a public local law. That law was wholly repealed and a law enacted adopting a totally different mode for the opening of streets. The repealing law contained no savings clause in favor of proceedings which were *in fieri* and incomplete under the former law. Thus the county road supervisors, appealing from the lower court decision making perpetual a preliminary injunction to restrain them from constructing the road, were without authority of any law then existing to proceed in the manner complained of to construct the road. The court affirmed the decree, stating: "It is settled doctrine, that courts in deciding questions arising before them, will look to the

when the legislature supplanted the M'Naghten-Spencer test with the mental disease or defect test, the judicial construction of the intent was that the new test did not apply to cases the trial of which began before the effective date of the Act whether or not they had been finally decided. That construction was enunciated almost three years before the legislature replaced the mental disease or defect test with the mental disorder test and in those three years has been affirmed and followed. We cannot say that the legislature was unaware of it when ch. 407 was enacted. Even if § 25 (a) were otherwise subject to the general rule as urged by Young we do not believe that the legislature intended that rule to apply. We think

law as it is at the time, and are not to be governed by what it may have been—unless proceedings under a prior existing law had been complete, or rights had become vested." At 181.

*Montague v. State,* 54 Md. 481 concerned the payment of inheritance taxes. An act changing the law became effective pending an appeal but it provided "that this Act shall take effect immediately after its passage, and shall apply to all cases of collateral inheritance tax heretofore claimed of, but not actually paid by, the husband of any decedent." At 484. The decision turned on this language.

In *Turner v. Bryan,* 83 Md. 373 it appeared that pending an appeal from an order dismissing Turner's petition to be reinstated as a voter after his name had been stricken from the rolls, the law relating to elections was repealed and an entire new system adopted, making a new registration necessary. Thus, the Court of Appeals said, Turner was not injured by the lower court's action and it was unnecessary for it to pass upon the questions presented by the appeal, which it thereupon dismissed. In *Meloy v. Scott,* 83 Md. 375 on similar facts the result was the same and for the same reasons.

In *C. & O. Canal v. West. Md. R. Co.,* 99 Md. 570, the Court said that in arriving at its conclusion it must take into consideration an Act relating to the rights under review even though it was enacted since the date of the decree appealed from. The Act authorized a condemnation of property of the Canal Company in which the State was financially interested as mortgagee or otherwise, referred to the action of the Board of Public Works approving plans submitted regarding bridges over the canal and required a plat of the railroad to be filed with the Secretary of State. But the Court found that the order appealed from was "merely modal in its nature and did not affect any substantial rights," observing that such orders were common and the leave of the Court which they afforded was ordinarily granted as a matter of course. At 576-577.

*Yorkdale v. Powell, supra,* concerned the application of the general rule to a zoning case. The Court found that an amendment in the law enacted while the case was pending on appeal made the main issue moot and dismissed the appeal.

it intended the mental disorder test to be applied in the same manner as the mental disease or defect test had been applied. We think that by merely designating the effective date of ch. 407 without further qualification the legislature intended that persons whose trial on a criminal charge began before that date be responsible *vel non* for their criminal conduct under the mental disease or defect test and that the test being the proper one to be applied below, it was the proper one to be applied on appeal. In so concluding we observe that there is no constitutional provision either requiring or prohibiting retroactivity in this regard. *Hammer v. State,* 3 Md. App. 96.

## II

Young questions the sufficiency of the evidence to sustain his conviction. The question is before us on the denial of a motion for judgment of acquittal made at the close of all the evidence. Rule 755 b; *Williams v. State,* 5 Md. App. 450. As presented and argued the contention is limited; it goes only to Young's criminal agency and not to the *corpus delicti,* and, in claiming that the evidence was not sufficient to establish that he was the murderer Young relies on the "circumstantial evidence rule" as set out in *Vincent v. State,* 220 Md. 232. It appears, and we so gathered from oral argument, that Young concedes that under the usual test as set out in *Williams v. State, supra,* the evidence was properly submitted to the jury. But he maintains that the evidence as to his criminal agency was solely circumstantial and therefore "the circumstances, taken together, must be inconsistent with, or such as to exclude every reasonable hypothesis or theory of innocence." He urges that the evidence did not meet this stricter test and mentions "a few of the theories of innocence which might reasonably flow from the circumstances adduced," asserting "and many more plausible than these would be quite evident" if the facts were reviewed under a burden imposed on the State that "the circumstances were so strong that they exclude any reasonable chance of defendant's in-

nocence." We discussed the so-called circumstantial evidence rule at length in *Nichols v. State,* 5 Md. App. 340, indicating that perhaps it did not mean precisely what it appeared to say. In *Metz v. State,* 9 Md. App. 15, 23 we said flatly that "* * * the test for sufficiency is the same whether the evidence be direct, circumstantial, or provided by rational inferences therefrom." In *Streat v. State,* 11 Md. App. 543, 547 we noted that in applying the sufficiency of the evidence rule as set out in *Williams* "no distinction is made between a case where there is direct evidence of guilt and a case where the evidence is circumstantial." And in *Graham v. State,* 13 Md. 171, 178 we observed that the statement that for evidence solely circumstantial to be sufficient to convict, the circumstances, taken together, must be inconsistent with, or such as to exclude every reasonable hypothesis or theory of innocence, does not accurately reflect the law, pointing to *Metz* and *Streat.* So even if the evidence as to Young's criminal agency were *solely* circumstantial, and we do not think it was, we find on our review of the transcript of the trial that the evidence adduced was sufficient in law, for it either showed directly or supported a rational inference of the facts to be proved, from which the jury could be properly convinced, beyond a reasonable doubt, of Young's guilt of the offense charged. We note that psychiatrists who testified on behalf of Young recounted what were admissions by Young of his criminal agency. For example, Dr. William N. Fitzpatrick, called by the defense, in discussing Young's responsibility for his criminal conduct said that Young "readily" confessed to the crime. Reading from his report of his examination of Young, the Doctor said: "The defendant oblivious to anything except a powerful impulse to hit [the victim] about the head, picked up a hammer and hit her repeatedly. No one else was around, and he struck her until she died."

We hold that the lower court did not err in denying the motion for judgment of acquittal with respect to the criminal agency of Young.

## III

At the close of all the evidence defense counsel [13] made, in addition to a motion for judgment of acquittal "on the ground that the State has not produced sufficient evidence to justify a conviction" under the indictment, a motion "for a verdict of acquittal and finding of not guilty on the indictment charging murder under the philosophy of murder perpetrated in the course of the commission of a felony, or an attempt to commit any of the felonies or crimes enunciated in the statute under the headings of attempted felonies." [14] The court denied the motion.

Young now complains because the jury were allowed to consider the degree of murder not only within the frame of reference that it was a wilful, deliberate and premeditated killing, Code, Art. 27, § 407, but that it was a murder within the ambit of § 410, the so-called "murder-felony statute." As proof that the jury were permitted to do this he points to the instructions in which the court explained the State's theory that the homicide was murder in the first degree as a felony murder. It read to the jury part of § 410, confining however, the crime perpetrated or attempted, to rape, and then discussed the crime of rape and attempted rape, pointing out that consent was not involved as the victim was only eleven years of age. The transcript of the proceedings does not disclose that challenge was made to these instructions. Rule 756 f. In fact at one point during a discussion of the statute pertaining to criminal responsibility, defense counsel said: "I don't think the jury

---

13. Not the same counsel representing Young on this appeal.

14. Code, Art. 27, § 410 provided: "All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape, sodomy, mayhem, robbery, burglary, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City jail, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree."

Chapter 326, § 1, Acts 1970, added the crimes of kidnapping, storehouse breaking and daytime housebreaking. By § 2 of the Act the amendment shall not apply to or affect the prosecution of any act or criminal offense occurring prior to 1 July 1970.

can ignore the felony statute." Thus, Young may not assign error in this part of the charge as of right. Rule 756 g. Nor do we find it to be plain error material to Young's rights. Young's point is that the State did not establish that the victim had been penetrated by a male sexual organ or even that the injuries in her vaginal area occurred while she was living. We do not believe that the evidence adduced must be construed so narrowly.

The body of the victim was found in a wooded area. Sergeant Robert DePaula of the Homicide Squad of the Baltimore City Police went to the area. "[T]he body was in a gully off the side of the road. The body was dressed in garb that was identical with the garb of the Lebowitz child was reported missing in. Her clothes were disarranged. She was spread-eagle, more or less, in the gully, and her pants were down around one ankle." The police roped off the area and called for a Medical Examiner. "We wanted an investigation on the scene." Photographs of the child as she was found show her naked from the waist down, her clothing bunched up around her waist and her underclothes around her ankles. The external description of the body given by the Medical Examiner was that a jumper was "bunched up over the waist. Panties and a white garter belt had been pulled down to the level of the ankles as have her nylon stockings." The autopsy report gave the evidence of trauma. In addition to extensive trauma of the head and neck and injuries to the left buttocks, left thigh, right ankle and right hand, there was trauma as to the vagina:

> "The external genitalia show no evidence of injury. The labia majora and labia minora are free of injury. The hymen, however, is torn in all quadrants and shows fresh hemorrhage. In addition the posterior fourchette of the vagina is also torn and contains fresh hemorrhage. The wound in the fourchette measures ½" in length. The vagina contains fresh hemorrhage. Examination of smears from the vagina, however, show no spermatozoa."

The diagnoses included "Recent lacerations of hymen and posterior fourchette of vagina." It was the medical opinion that "this 11 year old white female, Esther Lebowitz, died of head injuries which were the result of blows to the head. Lacerations to the vagina indicate that the victim was sexually molested." At the trial the Medical Examiner testified that the victim "had a laceration of the hymen and the posterior fourchette. This is the tissue around the vagina." He explained that the hymen is "at the opening of the vagina * * * the hymen is actually the covering; it's right on the surface, but it's covered by the folds, what they call the labia major, the lips of the vagina. So, in that sense, * * * it's inside [the vagina]." He said that some object would have had to penetrate the lips of the vagina in order to have caused the injury to the hymen. He described the fourchette of the vagina as "the portion of the posterior, where the labia and the hyman come together. It's an anatomical point. It's the posterior-most portion of the vagina." The injury to it would require some penetration of the lips of the vagina. On cross-examination he was asked: "Would the injuries to the vaginal area and hymen be consistent with a finger manipulation, Doctor, as well as with the injection of an erect penis, or thirdly with a foreign substance of some object of some kind?" His reply was: "Presumably, all three." He could not say "positively that it was a penis."

In the light of this evidence we do not see clear error material to Young's rights in instructing the jury that under the felony-murder statute a murder committed in the perpetration or attempt to perpetrate a rape is murder in the first degree. And we hold that, within the frame of reference of that statute, there was no error in denying the motion for judgment of acquittal. We believe the evidence was legally sufficient for the jury to find that the murder was committed in the perpetration of a rape or attempted rape. We find *Middleton v. State,* 6 Md. App. 380 to be factually apposite, its rationale appropriate and its holding controlling.

We note that the court below instructed the jury also with regard to murder in the first degree by reason of a wilful, premeditated and deliberate act under Art. 27, § 407. Young does not argue that the evidence as to this was not sufficient to go to the jury. In fact, it is quite evident from the transcript of the proceedings that it was not the strategy of the trial to attempt to establish that Young did not murder the child, but rather it was to show that he was not legally responsible for the murder. The trial tactics pursued were clearly in furtherance of this strategy.

## IV

As the judge started his charge he cautioned the jury that "any remarks that I may make, any instructions that I may give you, are only advisory. You may accept them, or you may reject them. That's particularly true in Maryland, where you are the judges of the law and the facts, which I shall discuss a little later on. So, I repeat, my instructions are purely advisory." A little later he elaborated on his statement that the jury were the judges of the law and the facts:

"Now, that doesn't mean that there is no law that covers the given situation. There is a law in this state, as far as I know in all states, that says it's a violation of the law to commit murder. But, when I say that you are the judges of the law as well as of the facts, I simply mean to say that you have a right to say to the court by your decision, well, that might be the law, it might be the statute involved in the case, but it's not the law of this case; we don't think it applies, and you don't apply it. In other words, you have a right, really, to ignore and determine for yourself what the law of the case really is, consistent, of course, with your oath of office to well and truly try the case, hear the evidence in the case and return a verdict in accordance with the facts."

Later he discussed the sanity issue. He read the applicable part of Art. 59, § 9 (a). He explained:

> "The law does not attempt to say what failures or conditions of the mind are properly to be regarded as disease or defect; rather, it leaves that judgment to the triers of the facts, in this case, you as the jury sitting in this case, to determine on the evidence before you, including, of course, the testimony and opinions of the medical experts, of all the witnesses, upon the issue."

Near the conclusion of his charge, in discussing possible verdicts, he said:

> "[Y]our first issue that you must determine is this question of responsibility, capacity, insanity, sanity, all of which you, the answer which you will answer yes or no. If you determine then by that issue that Mr. Young did not lack capacity or substantial capacity as the statute says, and have continued on with your deliberation, then you will have five possible verdicts to consider."

He told the jury what the five possible verdicts were.

Out of the presence of the jury, defense counsel excepted to that part of the charge in which the judge, discussing the jury being the judge of both law and fact, said that the jury had "a right to say to the Court by your decision, well, that might be the law, it might be the statute involved in the case, but it's not the law of this case; we don't think it applies, and you don't apply it." Counsel took issue to the phrase "we don't think it applies." He excepted to any theory given to the jury that they can ignore the statute, Article 59, § 9. The judge said he did not mean that. Counsel interpreted the court's remarks to suggest to the jury that they "can ignore a statute * * * that is the very heart of the defense, or the defendant's case here" and he thought this was

564

broader than the court intended it to be. The judge reiterated: "I don't mean that like that." He said: "They are bound by Article 59. * * * They can't ignore that definition. * * * They don't ignore, but they don't have to apply it. That's what I've said." The State disagreed that "there is any difference in the application of the jury being judges of the law and facts as to Article 27 and Article 59. There is absolutely no difference between the two." The judge said:

"I think the one is talking about a crime, whether certain facts constitute a crime. When you are dealing with situations involving the crime itself, they do have the right to say, to ignore it and say that is not the law of this case, but here we are talking about a definition the State had adopted whether, the determination of this sanity. They can't ignore that. You agree; is that your theory?"

Defense counsel agreed that it was his theory.

The judge said he would straighten it out. He did so by a further charge to the jury:

"Members of the jury, I just want to clarify one particular situation, really. I think, well, I am not sure whether I made it clear to you or not. I told you in the beginning that you are the judges of the law and the facts, but you don't overlook the fact or ignore the fact that you do have laws that relate to many situations. For instance, murder, but what I told you, in effect, or intended to, that you are not bound to accept the particular law or statute as the law of any given case. You have a right to say under the facts of this case, this statute, this law, which you say is on the statute books does not apply. You have a right to say that. I did not intend, however, for that to mean that you could ignore the provisions of the law which sets forth the

test of responsibility for criminal conduct. That is a definition that has been worked out and adopted by our state, that you accept that definition, that definition as the correct rule for the determination of this question of responsibility.

The facts, of course, you will have to determine for yourselves, and apply them to the rule that has been read to you and given you verbally any number of times."

No exception was taken to the supplementary instructions.

Having prevailed upon the judge below to give an instruction as he desired, on appeal Young claims the judge erred in so doing. He now construes the supplementary charge as telling the jury that they were not the judge of the law as it pertains to responsibility for criminal conduct but were bound by the statutory definition and that such definition could not be disregarded in arriving at a verdict.[15] Here again, there being no objection to the supplementary instruction as provided by § f of Rule 756, Young may not assign error as of right. Rule 756 g. We see no clear error material to Young's rights in the supplemental charge, particularly when considered with the instructions as a whole. "It is sufficient that the instructions taken as a whole correctly stated the law." *Shotkosky v. State,* 8 Md. App. 492, 509. We think they did.

Art. XV, § 5 of the Maryland Constitution provides that "[i]n the trial of all criminal cases, the Jury shall be the Judges of Law," and Rule 756 b, implementing the provision, directs the court in every case in which instructions are given to the jury to instruct them that "they are the judges of the law and that the court's instructions are advisory only."[16] In *Brady v. Maryland,*

---

**15.** Counsel on appeal states in appellant's brief that "the transcript is obviously deficient as an accurate replica of the judge's language." But when the stenographer checked his notes at counsel's request, he reported that the notes show only what was transcribed.

**16.** Rule 739 b, before it was revised and renumbered Rule 756

373 U. S. 83, 89 the Supreme Court said: "But Maryland's constitutional provision making the jury in criminal cases 'the Judges of Law' does not mean precisely what it seems to say" and referred in note 3 to Dennis, *Maryland's Antique Constitutional Thorn*, 92 U. of Pa. L. Rev. 34, 39, 43 and Prescott, *Juries as Judges of the Law: Should the Practice be Continued*, 60 Md. St. Bar Assn. Rept. 246, 253-254. In *Giles v. State*, 229 Md. 370, appeal dismissed, 372 U. S. 767, the Court of Appeals observed, at 383, that the provision "has not been construed as all inclusive, and some limitations upon its scope have been recognized ever since its adoption." One of the limitations so recognized is that "it is the duty of the jury to decide a case according to the established rules of law, and if they misapply the law to the prejudice of the accused, the trial court has the power to set aside the verdict and grant a new trial." *Id.*, at 384, citing *Beard v. State*, 71 Md. 275.[17] We feel that what the lower court here told the jury in its instructions taken as a whole was in effect the above limitation, that although they were the judges of law it was their duty to decide the case according to the established law. Then clearly within the court's advisory capacity, it told them of the established law. We find that the instructions maintained the distinction between the power of a jury to apply the law to the facts and the right of a jury to determine the law as well as the facts. See *Hamilton and Fletcher v. State*, 12 Md. App. 91, 98. We observe that we find nothing in the record to indicate that the jury did not correctly apply the law to the facts in the performance of its constitutional duty. We hold there was no plain error material to Young's rights for us "to take cognizance of and correct." Rule 756 g.

*Judgment affirmed.*

b effective 1 January 1962 provided that the jury should be told that it was the *final* judge of the law. (emphasis added).

17. Another of the recognized limitations is that the jury has no right to pass upon the constitutionality of a statute and that it was proper for the trial court to prohibit counsel from arguing that question before the jury. *Giles* at 383.