# MILDRED ROSE LOVE *v.* STATE OF MARYLAND

[No. 143, September Term, 1972.]

*Decided December 4, 1972.*

The cause was argued before MORTON, THOMPSON and SCANLAN, JJ.

*Michael Lee Kaplan* for appellant.

*Harry A. E. Taylor, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Michael Libowitz, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Appellant, Mildred Rose Love, was convicted of murder in the first degree by Judge Marshall A. Levin, sitting without a jury in the Criminal Court of Baltimore, and a sentence of life imprisonment was imposed.

It appears from the record that appellant entered a tavern in Baltimore City during the late afternoon of October 3, 1970. According to the owner of the tavern, she approached the bar, advised him she wanted to play the pinball machine, and requested a dollar's worth of change. At that time the deceased, Viola Watkins, who had been in the bar drinking since approximately 2:30 p.m., was sitting on a bar stool next to the appellant. The tavern owner testified that the deceased "had about forty or fifty cents in front of her, and when Miss Love, the defendant, was taking change from me, Vi thought that she was taking her change from the bar and she started fussing with Mildred." The owner stated, however, that Miss Love had not taken the deceased's money. He testified that "Miss Mildred got real excited about it, and she wanted to start fighting. One of the gentlemen there took Miss Mildred out. * * * Five minutes after she was taken out she came right back in the place. * * * She looked real upset and come right at Miss Vi.

* * * And Vi jumped off the stool facing her. * * * And it happened so fast, right away she stabbed her twice, Miss Love stabbed Miss Vi twice. * * * [A]ll I saw was the long blade of the knife. I didn't see the handle." The deceased was taken to a nearby hospital where she was pronounced dead on arrival. The autopsy report indicated that the victim had a blood alcohol rating of .26.

At the trial below a plea of not guilty by reason of insanity was entered on behalf of appellant. In support of that plea and to overcome the threshold presumption of appellant's sanity, Dr. John Marshall Hamilton, Superintendent of The Clifton T. Perkins State Hospital, was called on behalf of the appellant. Dr. Hamilton explained that he had been requested by Judge Charles D. Harris to conduct a "cursory examination" to determine "whether Mrs. Love required hospitalization or whether she should be maintained appropriately in the jail" pending her trial. He stated that "[e]ssentially the examination disclosed a person who was suffering from what I determined a residual schizophrenic set of symptoms, plus mental retardation of the magnitude which is classified as borderline mental retardation. Her actual full scale I.Q. was 66 on the psychologicals that we administered. * * * I think in my report I indicated that it would be useful to have a full range evaluation in a hospital setting to determine adequately the effect of her illness, the drugs she had been taking and the alcohol she had been drinking on her behavior at the time of the incident for which she is on trial took place, and I described her as being, in my opinion, only marginally responsible at best. This I know is relatively vague, but at the time I examined her I didn't think we were able to come to any firm kind of conclusion about her capacity at the time of the crime, but my feeling was that there certainly was enough doubt about her functioning so that she deserved to have a full range evaluation in the setting of a hospital for a sixty day period of time." He was asked by counsel for appellant how he drew the line "between marginal and the question of whether she was,

in fact, able to understand or know what she was doing at the time." Dr. Hamilton answered: "I wasn't able to establish for myself the kind of definiteness, you know, of drawing a line and saying on this side definitely she was not responsible and on this side she definitely was * * *."

On cross examination Dr. Hamilton was asked whether he had come to a firm conclusion as to whether she was responsible at the time of the alleged offense and he replied: "I don't have a firm opinion about that."

On the basis of this testimony the trial judge ruled that "there has been a sufficient rebutting [of the presumption of appellant's sanity] to require the State to produce whatever testimony and/or evidence it may have." The State thereupon called Dr. Sherrill Cheeks, Assistant Clinical Director, Springfield State Hospital. He stated that he was appellant's "physician during— from 1965 through 1968, at which time she was first admitted to Springfield State Hospital" and that he had also seen her "at a forensic staff conference" some months before trial. The following colloquy then took place between the Assistant State's Attorney and Dr. Cheeks:

"Q. And Doctor, do you have an opinion today within a reasonable degree of medical certainty as to whether or not Mildred Love is a person who, as a result of a mental disease or defect, lacks substantial capacity either to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law?
A. I believe that she does possess that capacity.
Q. And do you have an opinion today as to Mildred Love's competency to stand trial today?
A. I believe she does have that capacity."

On cross examination appellant's counsel asked him: "Doctor, what is the test for whether a person is sane or insane in the State of Maryland?" He replied: "If he

understands what he is doing, and if he understands the consequences of his act."

At the conclusion of Dr. Cheeks' testimony, the trial judge in the course of his ruling that appellant was legally sane at the time of the alleged crime stated:

> "I think the difficulty contained in this type of testimony is that lawyers and judges are confronted with a field in which they are really not as learned as the witness—certainly I am speaking for myself—and yet I think the key word is substantial in the test; that is to say, a Defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if at the time of such conduct, as a result of mental disease or defect, he or she lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Although the issue was not raised by the State or by the appellant in this appeal, it is perfectly evident that the trial judge, the State's Attorney, and the appellant's counsel all were proceeding on the assumption that the legal test of criminal insanity involved a determination of whether or not the accused was suffering from a "mental disease or defect." This was the law from 1967 to 1970 (see Md. Code, Art. 59, § 9 (a)).[1] However, under the law today and under the law at the time of the appellant's trial below, November 1971, whether the accused was suffering from a "mental disease or defect" played no role in a determination of the accused's criminal insanity. Md. Code, Art. 59, § 25 (a). As this Court stated through our then Chief Judge Murphy (presently Chief Judge of the Court of Appeals of Maryland) in *Sherrill v. State,* 14 Md. App. 146, 148:

> "Chapter 407 of the Acts of 1970, which be-

---

1. 1968 Replacement Volume.

came effective July 1, 1970, repealed Article 59
of the Maryland Code in its entirety and enacted
in its place a new Article 59. The test for crimi-
nal responsibility was set forth in Section 25 (a)
of the new Act. It was identical to that contained
in the repealed Section 9 (a) except that it sub-
stituted the term 'mental disorder' for the
phrase 'mental disease or defect.' But unlike the
former law, which contained no statutory defi-
nition of the terms 'mental disease or defect,'
the new law defined the term 'mental disorder'
in Section 3 (f) to mean 'mental illness or
mental retardation or any other form of be-
havioral or emotional illness resulting from any
psychiatric or neurological disorder.' "

Later, in *Young v. State,* 14 Md. App. 538, 544, Chief
Judge Orth (then Associate Judge) stated that the 1970
amendment created an exception "of the utmost signifi-
cance" and went on to say at 545-546:

"Applying the meaning of 'mental disorder'
and the meanings of the terms used in defining
its meaning as set out in § 3, the test reads:
A defendant is not responsible for criminal
conduct and shall be found insane at the
time of the commission of the alleged crime,
if at the time of such conduct he lacks sub-
stantial capacity either to appreciate the
criminality of his conduct or to conform
his conduct to the requirements of the law,
because of:

(1) any mental disorder which so sub-
stantially impaired his mental or
emotional functioning as to make
it necessary or advisable for his
welfare or for the safety of the
persons or property of others that
he receive care and treatment; OR

(2) a degree of subnormality of in-

tellectual development expected to be of life duration which reduced his capability to manage himself or his affairs; OR

(3) any other form of behavioral or emotional illness,

which, as to any of the three, were the result of any psychiatric or neurological disorder other than an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Having established that the lower court committed error in applying the outdated test for criminal insanity, the question remains whether the error was harmless. See *Sherrill, supra.* We think it was not.

Both doctors agreed that appellant was mentally retarded and mental retardation is a mental disorder (Md. Code, Art. 59, § 3 (f)); both agreed that she had suffered from schizophrenia (although at the time of the alleged crime it was in a remissive stage) and that schizophrenia is a mental disorder. The appellant herself testified that on the day of the alleged crime she had consumed three or four half pints of whiskey, that she was taking approximately 100 milligrams of Thorazine and had injected herself with cocaine.

Under all of the circumstances, we cannot say that the application of the wrong test at the trial below to determine appellant's criminal insanity was harmless error [1] and, accordingly, the judgment of conviction of first degree murder will be reversed and the case will be remanded for a new trial. In view of our conclusions we do not reach the issue that the evidence was legally insufficient to sustain the appellant's conviction.

*Judgment reversed; case remanded for a new trial.*

---

1. See *Truesdale v. State,* 16 Md. App. 260, 295 A. 2d 808, (*Daily Record,* November 21, 1972).