KYLE WINSTON SHERRILL *v.* STATE
OF MARYLAND

[No. 246, September Term, 1971.]

*Decided January 27, 1972.*

The cause was argued before MURPHY, C. J., and MOY-LAN and GILBERT, JJ.

*Robert C. Heeney,* with whom were *William F. Abell, Jr.,* and *Heeney, McAuliffe & McAuliffe* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *William A. Linthicum, Jr., State's Attorney for Montgomery County,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Appellant was indicted on June 2, 1970 for the alleged kidnapping on September 26, 1969 of six year old Julianne Voell, and for having assaulted and committed an unnatural and perverted sexual act upon her on the same date. At his arraignment on June 19, 1970 appellant pleaded that he was insane at the time of the commission of the alleged crimes. At that time the test of responsibility for criminal conduct was contained in Maryland Code, Article 59, Section 9 (a), *viz.,*

> "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct *as a result of mental disease or defect,* he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the require-

ments of law. As used in this section, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (Emphasis added.)

On June 26, 1970 appellant was referred to Clifton T. Perkins State Hospital for a psychiatric examination to determine his sanity.

Chapter 407 of the Acts of 1970, which became effective July 1, 1970, repealed Article 59 of the Maryland Code in its entirety and enacted in its place a new Article 59. The test for criminal responsibility was set forth in Section 25 (a) of the new Act. It was identical to that contained in the repealed Section 9 (a) except that it substituted the term "mental disorder" for the phrase "mental disease or defect." But unlike the former law, which contained no statutory definition of the terms "mental disease or defect," the new law defined the term "mental disorder" in Section 3 (f) to mean "mental illness or mental retardation or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder." [1] The new Act contained no provision, one way or the other, respecting the applicability of the new Section 25 (a) test for criminal responsibility to the trial of cases which, though commencing after the new Act's effective date (July 1, 1970), involved criminal acts perpetrated prior to that date.[2]

The Perkins State Hospital filed its report on August 27, 1970. It stated that appellant was presented before a medical staff conference on that date, and that it was the unanimous opinion of the medical staff (psychia-

---

1. The terms "mental illness" and "mental retardation" were defined in Sections 3 (g) and (h), respectively.

2. When, by Chapter 709 of the Acts of 1967, the General Assembly changed the test for criminal responsibility from the M'Naghten-Spencer rule to the American Law Institute test (the now repealed Section 9), it specifically provided in Section 2 thereof that "the provisions of this Act shall be applicable to all cases tried or scheduled for trial on and after the effective date of this Act [June 1, 1967]."

trists Nabors, Adamo, Freinek, and Sauer) that "[appellant] * * * did not suffer from a mental disease or defect at the time of the alleged offense such as to cause him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

The trial of the case began on October 27, 1970 before Judges Pugh, Mathias, and Moore, sitting without a jury in the Circuit Court for Montgomery County. The State adduced proof of the *corpora delicti* and of appellant's criminal agency, and rested on the presumption of sanity. Four psychiatrists then testified on appellant's behalf. Each was questioned as to appellant's responsibility for his criminal conduct in terms of the test set forth in Section 9 (a), *viz.*, whether in September 1969 when appellant allegedly committed the crimes, "as a result of mental disease or defect he * * * [lacked] substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Dr. Hertzberg testified that appellant was driven to commit his criminal acts by an "obsessive compulsive neurosis," which he classified as a mental disease, but not a psychosis. He said that appellant was suffering from pedophilia—the inability to gain sexual satisfaction except with very young children. He classified pedophilia as a "mental disorder," as a "mental illness," and as a "personality disorder." He testified that a person could be just as mentally ill with a neurosis or personality or character disorder as a person with a psychosis. Judge Pugh indicated a belief that a "mental disorder" was not a "mental disease" within the meaning of Section 9; the witness said there was no difference between the two terms. He testified that appellant was not criminally responsible because he was unable to conform his conduct to the requirements of law.

Dr. Crowley agreed with Dr. Hertzberg's diagnosis. He said appellant was suffering from a very severe and

primitive personality disorder with extreme sexual deviation, namely pedophilia, which he classified as a "mental disorder." [3] Dr. Crowley testified that appellant had a "mental disease" by reason of which he was unable to conform his conduct to the requirements of law.

Dr. Gray testified that appellant suffered from the "mental disease" of latent schizophrenia. He said that while the disease manifested itself in pedophilia, it was but a symptom of appellant's schizophrenia. Dr. Gray testified that pedophilia was a perversion, not a psychosis. Judge Pugh again indicated a belief that pedophilia was not a "mental disease." Dr. Gray testified in terms of the test for criminal responsibility outlined in Section 9 (a) that appellant lacked substantial capacity to conform his conduct to the requirements of law.

Dr. Hamman agreed with Dr. Gray's diagnosis that appellant was suffering from schizophrenia of a chronic nature and was not responsible for his criminal acts because by reason thereof he was unable to conform his conduct to the requirements of law. He testified that schizophrenia was a "mental disease." Asked whether "pedophilia" was a "mental disease," Dr. Hamman testified that it was a "mental illness," and a symptom of basic schizophrenia. He characterized pedophilia as a character neurosis, a character disorder, and a personality disorder.

After the court indicated that appellant's psychiatric evidence was sufficient to overcome the presumption of sanity, and that the State would be required to prove appellant's sanity beyond a reasonable doubt (see *Strawderman v. State*, 4 Md. App. 689), the State called three of the four Perkins Hospital phychiatrists who had participated in appellant's mental examination and who had found him responsible for his conduct at the time of the commission of the crimes.

Dr. Sauer testified that appellant's pedophilia was a

---

**3.** When Dr. Crowley stated that the test for criminal responsibility had "undergone a slight change as of July 1970," appellant's counsel stated, "We're not interested in that."

sexual deviation, a personality disorder, with no evidence of psychotic process. He rejected the diagnosis of the psychiatrists testifying on appellant's behalf. He said pedophilia was "a definite mental disorder characterized by intense desires to engage in fondling or sexual acts with children." He said that appellant's mental disorder was not of such intensity as to cause him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. He agreed in a general sense that appellant was "mentally ill" and had a "mental disease"; he said, however, that "pedophilia is not usually considered a disease," but instead was "a personality disorder, a sexual deviation." Dr. Sauer testified that there was no difference between a mental disease and a mental disorder.[4]

Dr. Nabors testified that appellant did not have a mental disease or defect rendering him not responsible for his criminal conduct. She said there was "no evidence that he is psychotic, and would, therefore, not be responsible for what he did." She indicated that the diagnosis of two of appellant's psychiatrists of "obsessive compulsive neurosis" was only a neurosis (as opposed to a psychosis) and was "not a mental disease that prevents people from conforming to the law." Asked what type of "mental disease" would cause a person to lack capacity to conform his conduct to the requirements of law, Dr. Nabors again indicated that a psychosis would constitute such a disease. Asked whether to be insane a person would have to have a psychosis, she replied that he would. She said that appellant suffered from pedophilia, a sexual deviation not classified as a mental illness. She restated her opinion that to be insane or "crazy," a person had to have "that kind of sickness * * * we call psychotic." Asked whether there were any other functional mental illnesses other than psychosis, Dr. Nabors

---

4. Appellant's counsel indicated during Dr. Sauer's testimony that the new term "mental disorder" was inapplicable because appellant's criminal conduct occurred prior to the effective date of the new Act.

said there were "a few, what they call effective mental diseases that are forms of psychosis, like manic-depressive psychosis and just a few others." She said that character neuroses are not generally considered mental illness. She said that pedophilia was not a mental disease, but was a mental disorder, the two terms being different. She said that there were "character disorders" and "neuroses" and that in addition "you have your mental diseases; psychoses and so forth."

Dr. Adamo next testified for the State. Asked in terms of the Section 9 (a) test whether appellant had a "mental disease or defect," Dr. Adamo answered that he "was not suffering from a mental disorder of such intensity as to cause him to lack capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." He testified that appellant had a sexual deviation, namely pedophilia; that it made no difference whether it was called a "mental disease" or a "mental disorder"; that appellant's disorder was not sufficiently severe to impair his capacity to appreciate the criminality of his conduct. He agreed that pedophilia is symptomatic of a more serious mental disorder "as in schizophrenia," but said that appellant did not suffer from schizophrenia nor did he have an "obsessive compulsive neurosis."

Two of the three judges of the court concluded that appellant "was sane at the time of the commission of the offense, as defined by Section 9 of Article 59 of the Code"; the other judge concluded that appellant was not responsible for his criminal conduct under the Section 9 (a) test. Each judge outlined the reasons for his decision. Judge Pugh found beyond a reasonable doubt that appellant was sane at the time of the commission of the offense because he "was not suffering from a mental disease as defined by said section [9 (a)]." Judge Moore found beyond a reasonable doubt that the appellant was suffering from a mental disease or defect, but that it did not cause him to lack substantial capacity to conform his

conduct to the requirements of law. He expressly disagreed with Judge Pugh's view "that no mental disease or defect was shown." Judge Mathias, dissenting from the majority conclusion, stated that he was not convinced beyond a reasonable doubt that the defendant was legally sane under Section 9 (a) of Article 59.

The majority of the court convicted appellant of kidnapping and he was sentenced to twenty years imprisonment.

I

Appellant contends that the majority of the court was clearly erroneous in finding him responsible under Section 9 (a) for his criminal acts. He asserts that the State's psychiatrists who found him sane had, at best, minimal contact with him. He claims that Dr. Nabors erroneously equated the term "mental disease or defect" with the term "psychosis," and that the court should have entirely disregarded her testimony.[5]

We observe at the outset that both counsel and the court were in error in believing that the test of criminal responsibility contained in Section 9 (a) was applicable at appellant's trial in October of 1970. As heretofore indicated, that section was repealed effective July 1, 1970 by Chapter 407 of the Acts of 1970, which simultaneously reenacted, in new Section 25 (a), the identical provisions of the repealed Section 9 (a) test of criminal responsibility with two significant differences: First, it substituted the term "mental disorder" for "mental disease or defect," and, second, unlike the term "mental disease or defect," which had never been legislatively defined, the term "mental disorder" was defined with great specificity in Section 3 (f) to mean and broadly encompass "mental illness or mental retardation or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder." No savings clause was included in Chapter 407 extending the

5. Appellant makes the same claim with respect to Dr. Sauer's testimony, but nothing in the record supports it.

operative effect of the "mental disease or defect" standard formerly contained in Section 9 (a) beyond the effective date of the new Act so as to make it applicable in the post July 1, 1970 trial of cases which involved criminal conduct perpetrated prior to that date. Nor would the general savings statute, Maryland Code, Article 1, Section 3, have that effect.[6] And we otherwise find nothing in the provisions of Chapter 407 even remotely indicating a legislative intention to carry over the "mental disease or defect" standard of Section 9 (a) to govern the merits of insanity pleas asserted at trials commencing after July 1, 1970. The fact that under Section 25 (a), as under former Section 9 (a), the validity of an accused's insanity plea is to be adjudged with reference to his mental condition as it existed at the time the criminal act was committed does not mean that the test for criminal responsibility in effect at that time is controlling. The defense of insanity at the time of the commission of the crime takes on substance and becomes truly meaningful when the case is tried, its merits placed in issue and decided. We think it clear that the Legislature, in repealing Section 9 (a), and its undefined "mental disease or defect" standard, and in en-

---

6. Insofar as pertinent, that section provides:
"The repeal, or the repeal and reenactment, or the revision, amendment or consolidation of any statute, or of any section or part of a section of any statute, civil or criminal, shall not have the effect to release, extinguish, alter, modify or change, in whole or in part, *any penalty, forfeiture, or liability,* either civil or criminal, which shall have been incurred * * * [thereunder] unless the repealing, repealing and reenacting, revising, amending or consolidating act shall expressly so provide; * * *." (Emphasis added.)
In the sense contemplated by this statute, a "penalty, forfeiture, or liability" is, we think, something in the nature of a criminal or civil sanction actually incurred by reason of the statute's operative provisions. See *Bell v. State,* 236 Md. 356; *Brooks v. State Board,* 233 Md. 98; *State v. Kennerly,* 204 Md. 412; *State v. Clifton,* 177 Md. 572; *Green v. State,* 170 Md. 134. See also *Bell v. Maryland,* 378 U. S. 226 (footnote 4), at page 234. The defense of insanity in criminal cases is not, in our opinion, either a "penalty, forfeiture, or liability," actually incurred, within the meaning of Section 3 or the Maryland cases construing that statute.

acting in its place the carefully defined "mental disorder" standard in Section 25 (a), intended that the latter test would govern in all cases tried after July 1, 1970, regardless of when the offense was committed. *Cf. Janda v. General Motors Corp.*, 237 Md. 161; *Wittel v. Baker*, 10 Md. App. 531. To otherwise conclude would be to ascribe to the Legislature an intention to have two separate tests for criminal responsibility in effect at the same time, based on the insignificant criterion of when the criminal act was committed. Had the Legislature so intended, it would not, in our view, have made Chapter 407 effective July 1, 1970, without expressly including in the Act a savings clause or like provision to indicate such an intention.

That the change in the criminal responsibility test introduced into the law by Chapter 407 was intended by the Legislature to be one of substance and not merely one of form is likewise clear. Considering the broad but precise legislative meaning given the term "mental disorder" by Section 3 (f) in juxtaposition with the undefined term "mental disease or defect," formerly contained in Section 9 (a), it is readily evident that the Legislature intended more than a simple substitution of terms commonly understood by psychiatrists, lawyers, and judges as having the same or equivalent meaning. Indeed, as illustrated by the testimony in the present case, there was a considerable conflict of expert opinion among the testifying psychiatrists with respect to whether appellant's mental condition, which was variously labeled a psychosis, a neurosis, schizophrenia, pedophilia, a character disorder, and a personality disorder, rose to the level of a "mental disease or defect" within the ambit of Section 9 (a), or was merely one of a multitude of mental disorders recognized and classified within the *Diagnostic and Statistical Manual of Mental Disorders,* the so-called psychiatrist's bible, published by the American Psychiatric Association. Some of the psychiatrists saw no difference between a "mental disease" and a "mental disorder"; others thought there was a difference. Some of the psychiatrists believed

that pedophilia was both a mental disease or defect and a mental disorder; others seemed uncertain as to whether it was a mental disease. One of the State's psychiatrists believed that pedophilia was not a mental disease or defect under Section 9 (a); that only a psychosis could qualify as a mental disease and that since pedophilia was not a psychosis, it could not be a mental disease, although it could be a mental disorder.

We think it not unlikely that it was because of the wide differences of opinion among psychiatrists respecting interpretation of the term "mental disease or defect," as used in Section 9 (a), that the Legislature determined to make use of a more concrete standard that all alike could understand and uniformly apply. Thus, under the Section 25 (a) test of criminal responsibility, recognizing that an abnormality manifested only by repeated criminal or antisocial conduct cannot qualify as a "mental disorder," psychiatrists would first be asked the threshold question—whether the accused, at the time of the crime, had a mental disorder, i.e., a "mental illness or mental retardation or any other form of behavioral or emotional illness"; if so, is it the result of "any psychiatric or neurological disorder," and, if so, did it cause the accused to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

Granting that error was committed by applying the Section 9 (a) test of criminal responsibility at appellant's trial in October of 1970, rather than the Section 25 (a) test, the question becomes whether, on the record before us and in view of the testimony, the error was so prejudicial as to require reversal of the judgment. In the circumstances of this case, we cannot find that the error was harmless. As indicated, it was the testimony of one of the State's psychiatrists, Dr. Nabors, that only a psychosis could be considered as falling within the meaning of "mental disease" and that since pedophilia was not a psychosis, appellant did not have a mental disease. An-

other of the State's psychiatrists expressed the opinion that pedophilia was not usually considered a mental disease. In view of this testimony, which Judge Pugh appeared by his decision to accept as correct, we think the court's divided (two to one) conclusion that appellant was criminally responsible under Section 9 (a) was obviously prejudicial to him. Since pedophilia is defined in the *Diagnostic and Statistical Manual of Mental Disorders*, at Section 302.2, as a non-psychotic mental disorder, we cannot say that it would not have qualified, under Section 25 (a), had that test been used, as a form of behavioral or emotional illness resulting from "any psychiatric or neurological disorder."

## II

Two other questions raised on appeal may arise on retrial of the case and merit our attention. First, appellant claims that a three-judge panel, sitting in lieu of a jury, must, like a jury, reach a unanimous decision.

Article 21 of the Maryland Declaration of Rights provides, in pertinent part, that in all criminal prosecutions, the accused has a right "to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." Nothing in this constitutional provision supports the argument that a defendant who waives a jury trial retains the right to a unanimous decision should he elect trial before a multiple-judge court. In *League v. State*, 36 Md. 257, 266, the Court of Appeals flatly held that if at a court trial the court "is composed of two or more members, a majority of them must concur in rendering the judgment." We think *League* controls the question in this case. We note, moreover, that at least three states have provided by statute that the decision of a majority of a multiple-judge court trying a criminal case would be controlling; the statutes have uniformly been upheld on the ground that no constitutional imperative of jury unanimity carries over to panels of judges. See *Commonwealth v. Scoleri*, 202 A. 2d 521 (Pa.) ; *State v. Robbins*, 199 N.E.2d 742 (Ohio) ; *People*

*v. DeCillis,* 199 N.E.2d 380 (N.Y.). The *DeCillis* case holds that the burden of proof beyond a reasonable doubt is not affected by split verdicts.

Appellant also contends that the court erred in refusing to permit defense psychologists to testify with respect to their professional diagnosis, or comment on the ultimate issue whether appellant was criminally responsible for his conduct. We held in *Saul v. State,* 6 Md. App. 540, that a psychologist could testify as to the results of psychological tests made by him but could not give an opinion as to the accused's sanity and criminal responsibility. We said at p. 549:

> "* * * Without question tests by and observations of qualified psychologists are invaluable to the psychiatrist in reaching his opinion as to whether as a result of mental disease or defect an accused is insane and the testimony of such psychologists as to the results of the tests made by him are properly admissible as a means of enlightening the trier of fact, to be considered by it as one of the means by which the psychiatrist reached his opinion as to the sanity or insanity of the accused. But an opinion as to the ultimate fact, whether or not the accused is insane under the test prescribed by §9(a), in fairness both to the accused and the State, should be reached by a medical diagnosis. Thus the opinion must be made by a medically trained psychiatrist in order to be admissible in evidence."

Appellant seeks to neutralize the effect of *Saul* by suggesting that a psychologist should be permitted to give his professional diagnosis when the psychiatrists testifying in the case on the ultimate issue of criminal responsibility base their opinions, at least in part, on the psychologist's diagnosis. We see no reason to so qualify the reach and rationale of *Saul.* Nor do we see any sound basis upon which to accept appellant's claim that since

a psychologist's "observations" concerning the accused are admissible in evidence, his professional diagnosis, necessarily included therein, should similarly be admissible. "Observations," in this context is a term limited to observations *of* the accused by the psychologist—actions, responses, test results, *viz.*, objective, demonstrable phenomena. A diagnosis is by definition an ultimate conclusion *about* the accused; it is the sum of what all the objective data means. *Saul* clearly limits the testimony of psychologists, as heretofore outlined, and we think the court below properly excluded the proffered testimony.

> *Judgment reversed; case remanded for a new trial; costs to be paid, one-half by the appellant, and one-half by the County Council of Montgomery County.*