584 A.2d 1287

**In re DEVON T.**

**No. 1989, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 30, 1991.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Former Public Defender, on the brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before MOYLAN, WENNER and CATHELL, JJ.

MOYLAN, Judge.

In a world dizzy with change, it is reassuring to find Daniel M'Naghten alive and well in juvenile court. It was, of course, M'Naghten's bungled attempt to assassinate Prime Minister Sir Robert Peel, killing by mistake Sir Robert's private secretary Edward Drummond, that led to his prosecution for murder and the assertion of his now eponymic insanity defense. When the House of Lords placed its imprimatur upon the jury's acquittal by reason of insanity, "the M'Naghten test" was impressed indelibly upon the Common Law of Anglo–America. *Regina v. M'Naghten*, 10 Cl. and Fin. 200, 8 Eng.Rep. 718 (1843).

The M'Naghten test, by name, crossed to New England within the year. *Commonwealth v. Rogers*, 48 Mass. 500 (1844). It was adopted by the Court of Appeals in 1888 as the controlling standard in Maryland, *Spencer v. State*, 69 Md. 28, 37, 13 A. 809 (1888); came to be called locally the "M'Naghten–Spencer" test, *Bradford v. State*, 234 Md. 505, 510, 200 A.2d 150 (1964), *Sherrill v. State*, 14 Md.App. 146, 148 n. 2, 286 A.2d 528 (1972); and remained the exclusive criterion of criminal insanity in this state until supplanted by the Acts of 1967, ch. 709.[1] The M'Naghten test was ultimately received by virtually every American jurisdiction and it remains the prevailing test for insanity in over one-half of American jurisdictions today. LaFave & Scott, *Criminal Law* (2d ed. 1986) at 312.

In enunciating a "right-wrong" test for criminal responsibility, the Law Lords in *Regina v. M'Naghten* did not radically break new ground but applied standards that had been with some regularity used in earlier English and American cases to measure criminal responsibility.[2] As the test assumed its proper name, however, it at least formal-

---

**1.** The 1967 legislation, then codified as Md.Ann.Code art. 59, § 9(a), adopted the test for criminal insanity recommended by the American Law Institute and contained in § 4.01 of the Model Penal Code. Subjected to several intervening changes not here pertinent, it is now codified as Health–General Article, § 12–108. Although the new legislative provisions changed significantly the procedures to be followed in adjudicating criminal responsibility of this type and expanded the list of mental conditions that may give rise to the criminal incapacity, the basic change in the substantive reformulation of what will constitute mental incapacity has been to add a volitional component to M'Naghten's exclusively cognitive component. M'Naghten's cognitive "right-wrong" test has essentially not been displaced but only supplemented.

**2.** *See* Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and its Subsequent Development in the United States: An Historical Survey* (hereinafter *"The Origins of the 'Right and Wrong' Test"*), 54 Calif.L.Rev. 1227 (1966). This article documents the fact that the "essential concept and phraseology of the rule" were already deeply imbedded in English and American law. It traced the right-wrong test to Hebrew law, Greek moral philosophy, Roman law, and medieval church history.

ized a statement of law that had been theretofore more protean and elusive. The heart of the M'Naghten test was that there could be no moral blameworthiness and, hence, no criminal responsibility if:

"... the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

*Regina v. M'Naghten*, 8 Eng.Rep. at 720. The pivotal criterion was *cognition*, as the House of Lords explained that the question to be put to the jury was that of:

"... whether the accused at the time of doing the act knew the difference between right and wrong."

*Id.*

What has not been adequately noted in the case law is that this cognitive capacity to distinguish right from wrong in the language of M'Naghten was not a characteristic of the insanity defense exclusively. It has traditionally been the common denominator criterion for a whole family of defenses based upon mental incapacity—insanity, infancy, mental retardation, intoxication (at least of the involuntary variety). The cause of the mental incapacity might vary from one such defense to the next but the ultimate nature of the resulting incapacity was a constant. In any of its manifestations, criminal responsibility traditionally turned and largely still turns upon the difference between a mind *doli capax* (capable of malice or criminal intent) and a mind *doli incapax* (incapable of malice or criminal intent). Capability or capacity might be eroded in various ways but the ultimate quality of the required mental capacity itself was unchanging. An understanding of the mental quality in issue in what had been one of its more familiar settings, therefore, will enhance our understanding of that same mental quality in other settings as well, including the here-pertinent setting of the infancy defense.

Hence, we tentatively advance the traditional M'Naghten test as pertinent to our present review of an adjudication of juvenile delinquency in the Circuit Court for Baltimore City. For the moment, however, let Daniel M'Naghten retire to the wings as we bring onto the stage the contemporary players.

### The Present Case

The juvenile appellant, Devon T., was charged with committing an act which, if committed by an adult, would have constituted the crime of possession of heroin with intent to distribute. In the Circuit Court for Baltimore City, Judge Roger W. Brown found that Devon was delinquent. The heart of the case against Devon was that when on May 25, 1989, Devon was directed to empty his pockets by the security guard at the Booker T. Washington Middle School, under the watchful eye of the Assistant Principal, the search produced a brown bag containing twenty zip-lock pink plastic bags which, in turn, contained heroin. Upon this appeal, Devon raises the following contentions:

1. That the State did not offer legally sufficient evidence to rebut his presumptive incapacity because of infancy; and

2. That the security guard's direction that he empty his pockets violated his Fourth Amendment right against unreasonable search and seizure.

### The Infancy Defense Generally

At the time of the offense, Devon was 13 years, 10 months, and 2 weeks of age. He timely raised the infancy defense. Initially, we will look at the infancy defense in its original (and still primary) context of a criminal prosecution, before turning briefly to the applicability of the defense to juvenile delinquency proceedings.

The case law and the academic literature alike conceptualize the infancy defense as but an instance of the broader phenomenon of a defense based upon lack of moral responsibility or capacity. The criminal law generally will only

impose its retributive or deterrent sanctions upon those who are morally blameworthy—those who know they are doing wrong but nonetheless persist in their wrongdoing.

After several centuries of pondering the criminal capacity of children and experimenting with various cut-off ages, the Common Law settled upon its current resolution of the problem by late Tudor and early Stuart times. As explained by LaFave & Scott, *Criminal Law*, (2d ed. 1986), at 398, the resolution was fairly simple:

> "At common law, children under the age of seven are conclusively presumed to be without criminal capacity, those who have reached the age of fourteen are treated as fully responsible, while as to those between the ages of seven and fourteen there is a rebuttable presumption of criminal incapacity."

The authors make clear that infancy was an instance of criminal capacity generally:

> "The early common law infancy defense was based upon an unwillingness to punish those thought to be incapable of forming criminal intent and not of an age where the threat of punishment could serve as a deterrent." (footnote omitted).

*Id.* at 399.

R. Perkins & R. Boyce, *Criminal Law*, (3d ed. 1982), in their chapter on "Limitations on Criminal Capacity," consider, along with insanity and intoxication, the defense of infancy:

> "According to the common law a child under the age of seven has no criminal capacity; one who has reached the age of fourteen has the same criminal capacity as an adult, that is, he is fully accountable for his violations of law unless incapacity is established on some other basis such as insanity; while between the ages of seven and fourteen there is a rebuttable presumption of criminal incapacity and conviction of crime is permitted only upon

clear proof of such precocity as to establish a real appreciation of the wrong done." (footnotes omitted).

*Id.* at 936.

Clark & Marshall, *A Treatise on the Law of Crimes,* (6th Wing. ed. 1958), at 391–392, emphasizes that the mental quality that is the *sine qua non* of criminal responsibility is the capacity to distinguish right from wrong:

> *"Children Under the Age of Seven Years.*—Children under the age of seven years are, by an arbitrary rule of the common law, conclusively presumed to be *doli incapax,* or incapable of entertaining a criminal intent, and no evidence can be received to show capacity in fact.
>
> *Children Between the Ages of 7 and 14.*—Children between the ages of 7 and 14 are presumed to be incapable of entertaining a criminal intent, but the presumption is not conclusive, as in the case of children under the age of 7. It may be rebutted by showing in the particular case that the accused was of sufficient intelligence to distinguish between right and wrong, and to understand the nature and illegality of the particular act, or, as it is sometimes said, that he was possessed of 'a mischievous discretion.' " (footnotes omitted).

The reasoning behind the rule is made very clear, at 391:

> "A child is not criminally responsible unless he is old enough, and intelligent enough, to be capable of entertaining a criminal intent; and to be capable of entertaining a criminal intent he must be capable of distinguishing between right and wrong as to the particular act."

Walkover, *The Infancy Defense in the New Juvenile Court,* 31 UCLA L.Rev. 503, 507 (1984), distills the rationale to a single sentence:

> "The infancy defense was an essential component of the common law limitation of punishment to the blameworthy."

*See also* Woodbridge, *Physical and Mental Infancy in the Criminal Law,* 87 U.Pa.L.Rev. 426 (1939); Kean, *The His-*

tory of Criminal Responsibility of Children, 53 Law.Q. Rev. 364 (1937).

With only dicta from Prevatte v. Director, 5 Md.App. 406, 412, 248 A.2d 170 (1968), as its harbinger, it was Adams v. State, 8 Md.App. 684, 262 A.2d 69 (1970), cert. denied, 400 U.S. 928, 91 S.Ct. 193, 27 L.Ed.2d 188 (1970), that recognized for the first time this venerable common law defense as part of the inherent law of Maryland:

"Since the Code of Hammurabi (circa 2250 B.C.) and down through the ages, society, under the law, has viewed and treated offenders of tender years in a light differently and more favorably than that accorded adults accused of breaching the law. Over the centuries and during the evolution of the common law of England, there emerged a rule of law governing 'the responsibility of infants' under which an individual below the age of seven years cannot be found guilty of committing a crime; an individual above fourteen years charged with a crime is to be adjudged as an adult; and between the ages of seven and fourteen there is a rebuttable presumption that such individual is incapable of committing a crime. In the absence of any pertinent legislative enactment in this State, the common law principles, as stated above, would appear to govern in Maryland and we so hold." (footnotes omitted) (emphasis supplied).

8 Md.App. at 687–688, 262 A.2d 69. See also Matter of Davis, 17 Md.App. 98, 100, 299 A.2d 856 (1973); In re William A., 313 Md. 690, 692–694, 548 A.2d 130 (1988).

### The Infancy Defense in Juvenile Court

 With the creation shortly after the turn of the present century of juvenile courts in America, diverting many youthful offenders from criminal courts into equity and other civil courts, the question arose as to whether the infancy defense had any pertinence to a juvenile delinquency adjudication. Under the initially prevailing philosophy that the State was acting in delinquency cases as parens patriae (sovereign parent of the country), the State was perceived to be not the retributive punisher of the child for

its misdeeds but the paternalistic guardian of the child for its own best interests. Under such a regime, the moral responsibility or blameworthiness of the child was of no consequence. Morally responsible or not, the child was in apparent need of the State's rehabilitative intervention and the delinquency adjudication was but the avenue for such intervention.

This was the philosophy that persuaded this Court, speaking through Judge Orth, in *Matter of Davis, supra,* to forbear from extending the defense of infancy to juvenile court proceedings as an inapposite criterion. The philosophical major premise from which we proceeded was explained by Judge Orth, at 17 Md.App. at 103–104, 299 A.2d 856:

> "It being clear that the finding in a juvenile proceeding that a child is delinquent is not the equivalent of a determination arrived at in a criminal proceeding that he has committed a crime, it follows that it is not a prerequisite to a finding that a person is a delinquent child that the State show under the common law rule that the child had such maturity in fact as to have a guilty knowledge that he was doing wrong, that is the capacity to commit crime.... The child is delinquent, not because he committed a crime, but ... because he requires supervision, treatment or rehabilitation.... He is not to be punished but afforded supervision and treatment to be made aware of what is right and what is wrong so as to be amenable to the criminal laws."

Over the course of the century, however, buffeted by unanticipated urban deterioration and staggering case loads, the reforming vision of Judge Julian Mack and the other founders of the movement faded. Although continuing to stress rehabilitation over retribution more heavily than did the adult criminal courts, delinquency adjudications nonetheless took on, in practice if not in theory, many of the attributes of junior varsity criminal trials. The Supreme Court, in *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068,

25 L.Ed.2d 368 (1970), acknowledged this slow but inexorable transformation of the juvenile court apparatus into one with increasingly penal overtones. It ultimately guaranteed, therefore, a juvenile charged with delinquency most of the due process protections afforded an adult charged with crime. Among those guarantees is that spelled out by *In re Winship*, at 397 U.S. 364, 90 S.Ct. at 1072–73.

"Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

*Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), soon made explicit what was implicit in *Winship*, that among the elements of a crime that the State is constitutionally obligated to prove beyond a reasonable doubt are mental elements as well as physical elements. A crime, by definition, consists of guilty mind as well as a guilty act—the *mens rea* as well as the *actus reus*. It follows ineluctably that if the State, when the issue is properly generated, is required to prove beyond a reasonable doubt the existence of a criminally responsible *mens rea* when proceeding against an adult, it cannot be relieved of that burden when proceeding in a quasi-penal fashion against a juvenile.

In terms of the applicability of the infancy defense to delinquency proceedings, the implications of the new dispensation are clear. A finding of delinquency, unlike other proceedings in a juvenile court, unmistakably connotes some degree of blameworthiness and unmistakably exposes the delinquent to, whatever the gloss, the possibility of unpleasant sanctions. Clearly, the juvenile would have as an available defense to the delinquency charge 1) the fact that he was too criminally insane to have known that what he did was wrong, 2) that he was too mentally retarded to have known that what he did was wrong, or 3) that he was too involuntarily intoxicated through no fault of his own to

have known that what he did was wrong. It would be inconceivable that he could be found blameworthy and suffer sanctions, notwithstanding precisely the same lack of understanding and absence of moral accountability, simply because the cognitive defect was caused by infancy rather than by one of the other incapacitating mechanisms.

In Walkover, *The Infancy Defense in the New Juvenile Court*, 31 UCLA L.Rev. 503 (1984), the author, at 549–552, criticizes *Matter of Davis, supra,* specifically as well as the *parens patriae* approach generally. *See also* Fox, *Responsibility in the Juvenile Court*, 11 Wm. & Mary L.Rev. 659 (1970); Westbrook, *Mens Rea in the Juvenile Court,* 5 J.Fam.L. 121 (1965). The Supreme Court of California in the case of *In re Gladys R.,* 1 Cal.3d 855, 83 Cal.Rptr. 671, 464 P.2d 127 (1970), pioneered the application of the infancy defense to delinquency proceedings.

The Court of Appeals, overruling *Matter of Davis,* brought Maryland in line with the modern trend in *In re William A.,* 313 Md. 690, 548 A.2d 130 (1988). Judge Eldridge pointed out, at 313 Md. at 696, 548 A.2d 130:

"A principal reason supporting the applicability of the defense is that juvenile statutes typically require, for a delinquency adjudication, that the child commit an act which constitutes a crime if committed by an adult, and if the child lacks capacity to have the requisite *mens rea* for a particular crime, he has not committed an act amounting to a crime."

The Court of Appeals went on to observe the changing nature of juvenile delinquency proceedings, pointing out, at 313 Md. 697–698, 548 A.2d 130:

"An additional reason given by the cases upholding the applicability of the infancy defense in juvenile delinquency proceedings, relates to the evolving nature of those proceedings. As explained by the Supreme Court of Washington in *State v. O.D., supra,* 102 Wash.2d [19] at 23, 685 P.2d [557] at 560 [1984]:

'The juvenile justice system in recent years has evolved from *parens patriae* scheme to one more akin to adult

criminal proceedings. The United States Supreme Court has been critical of the *parens patriae* scheme as failing to provide safeguards due an adult criminal defendant, while subjecting the juvenile defendant to similar stigma, and possible loss of liberty.' "

It goes on, at 313 Md. at 698, 548 A.2d 130, to quote with approval from Walkover, *supra*, 31 UCLA L.Rev. at 562:

"Careful review of the recent history of the juvenile court reveals that the juvenile justice system has turned from rehabilitation to principles of accountability in dealing with youthful offenders. In light of this, continued reliance on the rehabilitative ideal to undercut key protections against sanctioning the innocent in the justice process, such as the infancy defense, is intellectually and institutionally problematic."

The infancy defense was not applied to all juvenile court proceedings but only to delinquency adjudications, where moral blameworthiness is an integral part of the wrongdoing. "We point out, however, that our holding is limited to *delinquency* actions." 313 Md. at 699–670, 548 A.2d 130 (emphasis in original). With respect to other situations, where the conduct itself of the juvenile, irrespective of moral accountability, calls for some rehabilitative intervention on the part of the State, Judge Eldridge carefully pointed out that the State may still file a petition alleging a Child in Need of Supervision (CINS) or a Child in Need of Assistance (CINA). "As these proceedings are not necessarily based on the commission of acts constituting crimes, the infancy defense obviously has no relevance to them." *Id.* at 700, 548 A.2d 130.

In a juvenile delinquency adjudication, however, the defense of infancy is now indisputably available in precisely the same manner as it is available in a criminal trial.

## Subsidiary Incidents of the Infancy Defense

The availability of such a defense raises several subsidiary questions. What precisely is the *probandum*—the

quality of mind that has to be proved? To whom are allocated the burdens of proof (production and persuasion) with respect to that *probandum* ? What are the standards or levels of proof necessary to carry those burdens?

■ With respect to the allocation of both burdens, the answer is clear. Once the question of criminal incapacity because of infancy is legitimately in the case, the unequivocal command of the due process clause is that the burdens of proof (assuming the proper generation of the issue) are allocated to the State. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970).

It is equally clear, under *Winship*, that the State's constitutionally mandated standard of persuasion is that of beyond a reasonable doubt.

Those questions do not concern us here. Our attention, rather, turns to the two remaining questions: 1) what precisely is that quality of mind that constitutes criminal capacity in an infant? and 2) was the State's evidence in this case legally sufficient to satisfy its burden of production that the infant here possessed such mental capacity?

### What is Criminal Capacity in an Infant?

■ Before the juvenile master, the appellant timely raised the infancy defense. One party or the other (it matters not which) introduced the undisputed fact (it would not have mattered if the fact had been disputed) that at the time of the allegedly delinquent act, Devon was 13 years, 10 months, and 2 weeks of age. Thus, the issue of mental incapacity due to infancy was properly generated and before the court.

■ On that issue, Devon initially had the benefit of presumptive incapacity. The presumption having been generated, the State had the burdens (of both production and persuasion) of rebutting that presumption. Assuming that it met its burden of production, an issue we shall turn to in the next section of this opinion, the State successfully carried its burden of persuasion. The fact finder was

persuaded. Since the weighing of evidence (that admissible data which may persuade one fact finder not at all or only a little bit may persuade another fact finder a lot) is the exclusive prerogative of the fact finder, there is nothing before us with respect to the burden of persuasion.[3]

▪ To overcome the presumption of incapacity, then, what precisely was that quality of Devon's mind as to which the State was required to produce legally sufficient evidence? It was required to produce evidence permitting the reasonable inference that Devon—the Ghost of M'Naghten speaks:—"at the time of doing the act knew the difference between right and wrong."

We resort to the analogy between this particular incapacity and other incapacities as a precedential "backup" because the Maryland case law bearing directly upon this particular instance of the larger phenomenon is so scant. Only *Adams v. State,* 8 Md.App. 684, 262 A.2d 69 (1970), and *In re William A.,* 313 Md. 690, 548 A.2d 130 (1988), make any reference to the required state of mind. In *In re William A.,* moreover, although the references are by way of well-considered *dicta,* the actual holding, overturning *Matter of Davis,* 17 Md.App. 98, 299 A.2d 856 (1973), dealt with the general applicability of the infancy defense to delinquency proceedings.

The first of our analogues is incapacity due to involuntary intoxication. Although as a policy matter, general mental incapacity (even when, in fact, present) may never be predicated upon *voluntary* intoxication, involuntary intoxication may give rise to a defense of mental incapacity in much the same way that insanity traditionally did. The

---

**3.** Ordinarily, questions involving the burden of persuasion only get to an appellate court in jury trials. Even there, the only appellate issue is whether the judge, in advisory instructions, gave the jury the proper guidelines and definitions with respect to the pertinent burden of persuasion. When the judge is the fact finder, the clearly erroneous standard is *ipso facto* what would be, in a jury case, the very different issue of legal sufficiency—to wit, the satisfaction of the burden of production.

authorities generally analyzed the intoxication (provided it was involuntary) in terms of its corrosive effect upon the cognitive ability of the mind to discriminate between right and wrong. R. Perkins & R. Boyce, *Criminal Law*, (3d ed. 1982), observed, at 1005:

> "He does not have criminal capacity if his mind is so deranged for the moment that he is unable 'to know what he is doing and that it is wrong,' and if the particular jurisdiction goes beyond the right-wrong rule in dealing with insanity it should do likewise in cases of involuntary intoxication." (footnotes omitted).

W. LaFave & A. Scott, *Criminal Law*, (2d ed. 1986), point out, at 393–394:

> "Involuntary intoxication, on the other hand, does constitute a defense if it puts the defendant in such a state of mind, *e.g.*, so that he does not know the nature and quality of his act or know that his act is wrong, in a jurisdiction which has adopted the *M'Naghten* test for insanity." (footnote omitted).

The second of our analogues is incapacity due to mental retardation. The Common Law always treated mental retardation as a separate category of mental incapacity, although it analogized it to both infancy and lunacy as an effective cause of the inability to know right from wrong, to distinguish between good and evil. Woodbridge, *Physical and Mental Infancy in the Criminal Law*, 87 U.Pa.L.Rev. 426, 438 (1939), observed:

> "Early in the law it was recognized that idiocy was a factor negating criminal responsibility, with complete ignorance as its hall-mark." (footnote omitted).

*"The Origins of the 'Right and Wrong' Test,"* at 1233, quotes St. Augustine as he equates infants, idiots, and possibly lunatics as those unable to tell the difference between right and wrong:

> "All men have freedom but it is restrained in children, in fools, and in the witless who do not have reason whereby

they can choose the good from the evil." (footnote omitted).

Lambard, an Elizabethan writer, in his *Eirenarcha, or the Office of Justices of Peace* (1581), at 218, analogized the insane, the mentally retarded, and children as three classes all lacking capacity to distinguish right from wrong:

"If a madman or a natural fool, or a lunatic in the time of his lunacy, or a child that apparently hath no knowledge of good nor evil, do kill a man, this is no felonious act, nor anything forfeited by it ... for they cannot be said to have any understanding will."

M. Dalton, *The Countrey Justice* (1630), observed, at 244: "If one that is *'non compos mentis,'* or an ideot, kill a man, this is no felony; for they have not knowledge of good and evill, nor can have a felonius intent, nor a will or minde to doe harm.... An Infant ... may commit Homicide, and shall bee hanged for it, viz. if it may appeare ... that he had knowledge of good and evill, and of the perill and danger of that offence." (footnote omitted).

*The Origins of the 'Right and Wrong' Test, passim,* points out that Sir Edward Coke, Sir Matthew Hale, and Sir William Blackstone all regularly referred to the "good and evil" test as the distinction between those who are morally responsible for their criminal acts and those who are not, applying that test to "infants, idiots and lunatics" alike.

Mental retardation, just as the other incapacity defenses, was concerned with the cognitive ability, as classically defined by M'Naghten, to distinguish between right and wrong. As Judge Rosalyn Bell pointed out for this Court, in *Bricker v. State,* 80 Md.App. 532, 544, 565 A.2d 340 (1989), *rev'd on other grounds, State v. Bricker,* 321 Md. 86, 581 A.2d 9 (1990):

"[O]nce mental retardation is established, the sole determination is whether the mental retardation so affected the individual that he or she lacked the capacity to understand the consequences of his or her acts."

*See also* Menninger, *Mental Retardation and Criminal Responsibility: Some Thoughts on the Idiocy Defense,* 8 Int'l J.L. & Psychiatry 343, 349 (1986); Ellis & Luckasson, *Mentally Retarded Criminal Defendants,* 53 Geo.Wash.L. Rev. 414 (1985).

Maryland has recently merged two of these traditionally distinguishable incapacity defenses into one, broadening its test for "insanity" or "criminal responsibility" to include as an effective cause thereof not only "mental disorder" but also "mental retardation." Health–Gen. Art., § 12–108(a) (1982, 1990 Repl.Vol).[4]

The third and final analogue is the thoroughly litigated defense of incapacity due to criminal insanity during the approximate century and a quarter when that defense was analyzed exclusively in terms of cognitive capacity under the M'Naghten test.[5]

The analogy between incapacity due to infancy and incapacity due to insanity, mental retardation, or involuntary intoxication has lost some of its original symmetry to the extent that those latter incapacities have been broadened (directly or indirectly) to include a volitional as well as a

---

**4.** The merger was somewhat checkered as the two arguably merged in 1967, were formally merged in 1970 (Acts of 1970, ch. 407, § 2), unmerged in 1972 (Acts of 1972, ch. 345), and remerged in 1980 (Acts of 1980, ch. 823). The details of this equivocation are not pertinent to this discussion. *See,* however, the excellent analysis of this checkered history by Judge Rosalyn Bell, in *Bricker v. State,* 80 Md.App. 532, 537–539, 565 A.2d 340 (1989), *rev'd on other grounds, State v. Bricker,* 321 Md. 86, 581 A.2d 9 (1990). *See also Johnson v. State,* 292 Md. 405, 426–427, 439 A.2d 542 (1982).

**5.** When we speak of incapacity due to insanity, we use that term in this generic sense, as it was traditionally used in Maryland and as it is still used in much of the common law world. The post–1967 Maryland law, especially since *Langworthy v. State,* 284 Md. 588, 399 A.2d 578 (1979), and *Pouncey v. State,* 297 Md. 264, 465 A.2d 475 (1983), seems to have driven a wedge between criminal responsibility and criminal capacity, terms that had always been thought to be identical. In any event, we make it clear that we are not analogizing the infancy defense to the current Maryland law of criminal insanity or criminal irresponsibility.

cognitive component. The infancy defense retains its exclusive concern with the cognitive element.

When *Adams v. State, supra,* first incorporated the infancy defense into Maryland law, the opinion of Judge Morton, at 8 Md.App. at 688, 262 A.2d 69, made it very clear that the pivotal mental quality being examined was M'Naghten's classic cognitive appreciation of the difference between right and wrong:

> "It was, therefore, incumbent upon the State to produce sufficient evidence to overcome the presumption that the appellant was *doli incapax,* an expression ordinarily employed by the text writers. The proof necessary to meet this burden has been variously phrased: It must be shown that the individual 'had discretion to judge between good and evil;' 'knew right from wrong;' had 'a guilty knowledge of wrong-doing;' was 'competent to know the nature and consequences of his conduct and to appreciate that it was wrong.' Perhaps the most modern definition of the test is simply that the surrounding circumstances must demonstrate, beyond a reasonable doubt, that the individual knew what he was doing and that it was wrong." (footnote omitted).

In *In re William A., supra,* Judge Eldridge, at 313 Md. at 699, 262 A.2d 69, perceptively stressed that the critical mental faculty for rendering an infant morally responsible for his otherwise delinquent actions was that same cognitive or intellectual capacity that would enable an adult to entertain a criminal *mens rea:*

> "As previously discussed, Maryland law defines a 'delinquent act' as 'an act which would be a crime if committed by an adult.' ... Most crimes require some *mens rea* characteristics; they are elements of the crimes. If, when one commits an act, the requisite *mens rea* for a crime does not exist, the act does not constitute a crime.... The defense of infancy relates to the presence or absence of the *mens rea* required for an act to constitute a crime.... Consequently, the infancy defense relates to whether the act committed by a juvenile

'would be a crime if committed by an adult.' " (citations omitted).

In short, when Devon walked around the Booker T. Washington Middle School with twenty zip-lock bags of heroin, apparently for sale or other distribution, could Devon pass the M'Naghten test? Was there legally sufficient data before him to permit Judge Brown to infer that Devon knew the difference between right and wrong and knew, moreover, that what he was doing was wrong?

### The Legal Sufficiency of the Evidence to Prove Devon's Knowledge of Right and Wrong

As we turn to the legal sufficiency of the evidence, it is important to know that the only mental quality we are probing is the cognitive capacity to distinguish right from wrong. Other aspects of Devon's mental and psychological make-up, such as his scholastic attainments, his I.Q., his social maturity, his societal adjustment, his basic personality, etc., might well require evidentiary input from psychologists, from parents, from teachers or other school authorities, etc. On knowledge of the difference between right and wrong, however, the general case law, as well as the inherent logic of the situation, has established that that particular psychic phenomenon may sometimes permissibly be inferred from the very circumstances of the criminal or delinquent act itself. Indeed, *Adams v. State*, at 8 Md.App. at 688, 262 A.2d 69, spoke of the fact that "the *surrounding circumstances must demonstrate* ... that the individual knew what he was doing and that it was wrong." (emphasis supplied).

■ Before looking at the circumstances of the delinquent act in this case, as well as at other data pointing toward Devon's awareness that he was doing wrong, a word is in order about the quantity of proof required. *In re William A.*, at 313 Md. at 693–694, 548 A.2d 130, quotes with approval from *Adams v. State*, 8 Md.App. at 688–689, 262 A.2d 69, in pointing out:

"It is generally held that the presumption of *doli incapax* is 'extremely strong at the age of seven and diminishes gradually until it disappears entirely at the age of fourteen....' Since the strength of the presumption of incapacity decreases with the increase in the years of the accused, the quantum of proof necessary to overcome the presumption would diminish in substantially the same ratio." (footnote omitted).

*See also* R. Boyce & R. Perkins, *Criminal Law,* (3d ed. 1983), at 936.

That kind of a sliding standard of proof or inverse proportion is relatively rare in law. Because the weighing of evidence (if the case law really means what it says) is in the *unfettered* discretion of the fact finder, that sliding standard of proof cannot, as a matter of pure logic, affect the literal issue of the legal sufficiency of the evidence, that is, the burden of production. It speaks volumes, however, about the burden of persuasion. It thereby casts at least reflected light on the issue before us, as it communicates a strong sense of precisely what it is that is being adjudicated. Some analysis may be helpful as to how a presumption "diminishes gradually until it disappears entirely," as to how "incapacity decreases" as age increases, and as to how "the quantum of proof ... diminish[es] in substantially the same ratio."

On the issue of Devon's knowledge of the difference between right and wrong, if all we knew in this case were that Devon's age was at some indeterminate point between his seventh birthday and his fourteenth birthday, the State's case would be substantially weaker than it is now. The evidence before Judge Brown that Devon, at the time of the allegedly delinquent act, was 13 years, 10 months, and 2 weeks of age was substantial, although not quite sufficient, proof of his cognitive capacity.

The applicable common law on *doli incapax* with relation to the infancy defense establishes that on the day before their seventh birthday, no persons possess cognitive capacity. (0 per cent). It also establishes that on the day of their

fourteenth birthday, all persons (at least as far as age is concerned) possess cognitive capacity. (100 per cent). On the time scale between the day of the seventh birthday and the day before the fourteenth birthday, the percentage of persons possessing such capacity steadily increases. The statistical probability is that on the day of the seventh birthday, at most a tiny fraction of one per cent will possess cognitive capacity. Conversely, on the day before the fourteenth birthday, only a tiny fraction of one per cent will lack such cognitive capacity. Assuming a steady rate of climb,[6] the mid-point where fifty per cent of persons will lack cognitive capacity and fifty per cent will possess it would be at 10 years and 6 months of age. That is the scale on which we must place Devon.

▆▆▆▆ We stress that the burden in that regard, notwithstanding the probabilities, was nonetheless on the State. The impact of the allocation of the burden of proof to the State is that the infant will enjoy the benefit of the doubt. The fact that the quantum of proof necessary to overcome presumptive incapacity diminishes in substantially the same

---

**6.** The climb in cognitive capacity from the seventh birthday through the fourteenth birthday, of course, has not been charted with actuarial precision by the social sciences. The rise in maturity of the group as a whole may be a linear progression at a regular rate of climb. There may, however, be plateaus interrupting the upward progression. There might even be a parabolic curve, concentrating much of the statistical advance of the group as a whole into the last year or two rather than having it spread evenly across the course of the seven years.

Whatever the configuration of the maturity chart, however, Devon had moved 98.2 per cent of the way, on the timeline of his life, from his seventh birthday to his fourteenth birthday. Assuming a regular linear progression, simply for illustrative purposes, that would mean that of all persons in Devon's particular age group, 98.2 per cent would be expected to possess cognitive capacity and 1.8 per cent would be expected to lack it. The State's burden, therefore, would not be to prove that Devon was precociously above average but only to satisfy the court that Devon fell within the upper 98.2 per cent of his age group and not within the subnormal 1.8 per cent of it.

In any event, whatever the statistical rate of progress or the maturity curve might be, Devon had moved 98.2 per cent of the way from its beginning point to its terminus.

ratio as the infant's age increases only serves to lessen the State's burden, not to eliminate it. The State's burden is still an affirmative one. It may not, therefore, passively rely upon the mere absence of evidence to the contrary.

■ We hold that the State successfully carried that burden. A minor factor, albeit of some weight, was that Devon was essentially at or near grade level in school. The report of the master, received and reviewed by Judge Brown, established that at the time of the offense, Devon was in middle school, embracing grades 6, 7, and 8. The report of the master, indeed, revealed that Devon had flunked the sixth grade twice, with truancy and lack of motivation as apparent causes. That fact nonetheless revealed that Devon had initially reached the sixth grade while still eleven years of age. That would tend to support his probable inclusion in the large majority of his age group rather than in a small and subnormal minority of it.

We note that the transcript of the hearing before the juvenile master shows that the master was in a position to observe first-hand Devon's receiving of legal advice from his lawyer, his acknowledgement of his understanding of it, and his acting upon it. His lawyer explained that he had a right to remain silent and that the master would not infer guilt from his exercise of that right. He acknowledged understanding that right. His lawyer also advised him of his right to testify but informed him that both the assistant state's attorney and the judge might question him about the delinquent act. Devon indicated that he wished to remain silent and say nothing. Although reduced to relatively simple language, the exchange with respect to the risk of self-incrimination and the privilege against self-incrimination forms a predicate from which an observer might infer some knowledge on Devon's part of the significance of incrimination.

The exchange, moreover, might have significance in two distinct evidentiary regards. It suggests that Devon's lawyer, who presumably had significant opportunity to talk to

him before the hearing, concluded that Devon understood the significance of criminality and incrimination. Under the classic case in all of the evidence textbooks of *Wright v. Tatham*, 5 Cl. & Fin. 670 (1838), this belief on the part of a close observer is relevant evidence for the proposition that the thing believed is true. In *Wright v. Tatham* itself, certain letters from a nephew in North America and certain actions by the village curate indicated that they believed that Old Marsden was competent to make a will. Their belief that he was competent was deemed relevant evidence that he was competent. In this regard, we see little distinction between young Devon and Old Marsden.

The significance of the colloquy in this case, moreover, is far more direct. Here, the master was in a position to observe Devon closely throughout the exchange. It does, to be sure, require us to extrapolate that Devon's mental capacity on the day of the hearing, July 20, reflected his mental capacity two months earlier on May 25. That precise situation, however, was before the Court in *Adams v. State, supra.* The appellant Adams there was 13 years, 9 months, and 2 weeks old at the time of the alleged murder; one month younger than Devon here at the time of his alleged delinquency. Adams there, as Devon here, "did not testify in his own defense at the guilt or innocence stage of the trial." 8 Md.App. at 689 n. 7, 262 A.2d 69. Adams there, as Devon here, nonetheless received legal advice from his lawyer under the watchful eye of the judge. We found that fact very significant in holding that the evidence there was legally sufficient to overcome the presumption of incapacity due to infancy:

"This conclusion was not precipitously reached by the lower court but was made at the conclusion of the entire trial. It was arrived at only after the trial judge had weighed the demeanor, conduct and comprehension of Adams while being interrogated on the witness stand, prior to trial, by both the court and his counsel concern-

ing his understanding of the right to a jury trial." (footnote omitted).

8 Md.App. at 689, 262 A.2d 69.

The transcript that was received and reviewed by Judge Brown revealed yet a further exchange between the juvenile master and Devon, also not without some significance. After Devon and his companion Edward had already been adjudicated delinquent and when no further risk of incrimination inhered, the master, prior to disposition, asked each of the two what, if anything, he would like to say and was met by "stonewalling":

"Master Price: Edward, is there anything you want to say to me about whether or not you want to be on community detention? (inaudible) Get these drugs?

Edward?

Devon?

Neither one of you want to tell me. Right? Which shows that you are hanging around with the wrong people and protecting them. Right?"

This inferable allegiance to the Underworld's "Code of Silence" suggests that Devon and Edward were no mere babies caught up in a web they did not comprehend. The permitted inference, rather, was that they were fully conscious of the ongoing war between lawful authority and those who flout it and had deliberately chosen to adhere to the latter camp.

We turn, most significantly, to the circumstances of the criminal act itself. As we do so, we note the relevance of such circumstances to the issue at hand. R. Perkins & R. Boyce, *Criminal Law*, (3d ed. 1982), points out, at 938:

"The prosecution, in brief, cannot obtain the conviction of such a person without showing that he had such maturity in fact as to have a guilty knowledge that he was doing wrong. Conduct of the defendant such as concealing himself or the evidence of his misdeed may be such under all the circumstances as to authorize a finding of such maturity." (footnotes omitted).

W. LaFave & A. Scott, *Criminal Law*, (2d ed. 1986), speaks to the same effect, at 399–400:

"Conduct of the defendant relating to the acts charged may be most relevant in overcoming the presumption. Thus hiding the body, inquiry as to the detection of poison, bribery of a witness, or false accusation of others have all been relied upon in finding capacity." (footnote omitted).

In overturning an intermediate appellate court which had declined to give appropriate significance to such circumstances, the Supreme Court of California, speaking through Justice Stanley Mosk, observed, in *In re Tony C.*, 21 Cal.3d 888, 901, 148 Cal.Rptr. 366, 582 P.2d 957 (1978):

"The facts are uncontradicted, and their implications are equally plain. Tony's constant use of the threat of deadly force demonstrates that he knew his victim would not submit to sexual intercourse without being exposed to great bodily harm. *His conduct in taking her to a secluded location behind a fence on a dead-end street shows he was aware that he had to accomplish his intended deed in private in order to minimize the risk of detection and punishment.* And his act of asking his victim if she intended to call the police, followed by his flight from the scene, manifested both knowledge of illegality and consciousness of guilt. Taken together, these facts constitute clear—even overwhelming—proof that throughout the attack Tony well knew the wrongfulness of his conduct within the meaning of Penal Code section 26." (emphasis supplied).

Just such a use of a secluded location or concealment was present in this case. The case broke when a grandmother, concerned enough to have had her own live-in grandson institutionalized, complained to the authorities at Booker T. Washington Middle School that several of her grandson's classmates were being truant on a regular basis and were using her home, while she was out working, as the "hide out" from which to sell drugs. Although the initial suspicion was directed toward Edward, it ultimately appeared

that Edward and Devon were in the enterprise together. Children who are unaware that what they are doing is wrong have no need to hide out or to conceal their activities.

The most significant circumstance was the very nature of the criminal activity in which Devon engaged. It was not mere possession of heroin. It was possession of twenty packets of heroin with the intent to distribute. This was the finding of the court and it was supported by the evidence. There were no needle marks or other indications of personal use on Devon's body. Nothing in the information developed by the Juvenile Services Agency on Devon and his family gave any indication that this sixth grader, directly or indirectly, had the affluence to purchase drugs for himself in that amount. Indeed, a statement he gave to the interviewer from the Juvenile Services Agency acknowledged that he had been selling drugs for two days when the current offense occurred. His motivation was "that he just wanted something to do."

The evidence in this case affirmatively indicated that Devon and Edward and several other students had been regularly using the absent grandmother's home as a base from which to sell drugs. The circumstances clearly indicated that Devon and his companions were not innocent children unaware of the difference between games and crimes but "street wise" young delinquents knowingly involved in illicit activities. Realistically, one cannot engage in the business of selling drugs without some knowledge as to sources of supply, some pattern for receiving and passing on the money, some network of potential customers, and some *modus operandi* to avoid the eye of the police and of school authorities. It is almost inconceivable that such a crime could be engaged in without the drug pusher's being aware that it was against the law. That is, by definition, criminal capacity.

We hold that the surrounding circumstances here were legally sufficient to overcome the slight residual weight of the presumption of incapacity due to infancy.

*Search and Seizure*

 The search occurred when the school security guard, in the presence of the assistant principal, ordered Devon to empty his pockets. Because the security guard and the assistant principal were public school employees,[7] the reasonableness of this search is governed by *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The reasonableness of a search conducted by a public school authority, as opposed to that of one conducted by an investigative police officer, is judged by the articulable suspicion standard of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The reason for this lesser standard of reasonableness is two-fold: 1) because the school authority is not a trained police officer concerned primarily with the discovery of evidence of crime, and 2) because the mixed mission of the school authority is to protect not only the constitutional rights of the student who may be a drug pusher but equally, perhaps more importantly, to protect the health and welfare of the entire school community from the ravages of that drug pusher. The parents of those other students, entrusting their children to the public charge, are entitled to expect nothing less.

Articulable suspicion for the search of Devon abounded. The trail led first from the concerned grandmother to Edward and from Edward directly to Devon. Security guard William Jackson took the complaint from the concerned grandmother that Edward J. and a group of other students from the school were hiding out in her house during the school day and were selling drugs out of the house. The very next morning at the school, a reliable student informant told Officer Jackson that he needed "to check Edward J. this morning." After Edward J. arrived a few minutes later, Officer Jackson summoned him to the

---

7. The clear suggestion of *New Jersey v. T.L.O., supra,* is that the Fourth Amendment would not apply to employees of parochial or other private schools for the reason that those employees are not agents of government.

assistant principal's office. Twice he emptied his two front and two rear pockets but refused to empty "the one on his right leg which has a zipper." As he turned and started to walk through the door, Officer Jackson grabbed him, put his hand into the zippered pocket he had sought to protect, and recovered twenty vials of cocaine. Edward was placed under arrest. A further search of him revealed ten more vials of cocaine in another pants pocket.

After initially replying to inquiries about his source of drugs that he "doesn't snitch," he ultimately said to Officer Jackson, "You better get Devon T." When Officer Jackson asked why, Edward replied, "You just better get him, he was with me."

It was at that point that Officer Jackson summoned Devon from his classroom to the assistant principal's office and asked him to empty his pockets. We do not hesitate to hold that Officer Jackson had abundant articulable suspicion to do so.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.